UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | | |
|---|---|---|---|---|
| IN RE: | ) | 3:09-CV-006 | 3:09-CV-555 | 3:09-CV-584 |
| | ) | 3:09-CV-009 | 3:09-CV-563 | 3:09-CV-589 |
| | ) | 3:09-CV-014 | 3:09-CV-564 | 3:09-CV-590 |
| TENNESSEE VALLEY AUTHORITY | ) | 3:09-CV-048 | 3:09-CV-565 | 3:09-CV-591 |
| ASH SPILL LITIGATION | ) | 3:09-CV-054 | 3:09-CV-566 | 3:09-CV-592 |
| | ) | 3:09-CV-064 | 3:09-CV-568 | 3:09-CV-593 |
| | ) | 3:09-CV-114 | 3:09-CV-569 | 3:09-CV-594 |
| | ) | 3:09-CV-491 | 3:09-CV-570 | 3:09-CV-595 |
| | ) | 3:09-CV-495 | 3:09-CV-571 | 3:09-CV-596 |
| | ) | 3:09-CV-496 | 3:09-CV-572 | 3:09-CV-597 |
| | ) | 3:09-CV-497 | 3:09-CV-576 | 3:09-CV-602 |
| | ) | 3:09-CV-504 | 3:09-CV-577 | 3:09-CV-603 |
| | ) | 3:09-CV-517 | 3:09-CV-578 | 3:09-CV-604 |
| | ) | 3:09-CV-529 | 3:09-CV-579 | 3:09-CV-605 |
| | ) | 3:09-CV-550 | 3:09-CV-580 | 3:10-CV-189 |
| | ) | 3:09-CV-551 | 3:09-CV-581 | 3:10-CV-190 |
| | ) | 309-CV-553 | 3:09-CV-582 | 3:10-CV-191 |
| | ) | 3:09-CV-554 | 3:09-CV-583 | |
| | ) | (VARLAN/GUYTON) | | |

## MEMORANDUM OPINION AND ORDER

This litigation consists of the more than fifty above-captioned cases filed against

defendant Tennessee Valley Authority ("TVA") following the December 22, 2008 failure of

a coal ash containment dike at TVA's Kingston Fossil plant in Roane County, Tennessee (the

"KIF plant"). Before the Court are TVA's Motions for Summary Judgment on Plaintiffs'

Tort Claims on the Nondiscretionary Conduct Issue (the "Nondiscretionary Conduct

Motions") [Doc. 176].[1]

_____

[1]Unless otherwise specified, all docket entry notations are numbered according to the docket
entry sheet in *Chesney, et al. v. TVA, et al.*, Case No. 3:09-CV-09.

In the Nondiscretionary Conduct Motions, TVA has moved for summary judgment on all plaintiffs' tort claims on grounds that plaintiffs have not shown that nondiscretionary conduct by TVA caused the dike failure and resulting coal ash spill. In opposition to TVA's motions, plaintiffs have submitted five separate response briefs: the *Chesney* brief [*Chesney, et al. v. TVA, et al.*, Case No. 3:09-CV-09, Doc. 192]; the *Turner* brief [*Turner, et al. v. TVA*, Case No. 3:09-CV-495, Doc. 45];[2] the *Armes* brief [*Armes, et al. v. TVA*, Case No. 3:09-CV-491; Doc. 36];[3] the *Mays* brief [*Mays v. TVA*, Case No. 3:09-CV-06, Doc. 100];[4] and the *Daugherty* Brief [*Daugherty, et al. v. TVA*, Case No. 3:10-CV-189, Doc. 34].[5] TVA has filed consolidated reply briefs to plaintiffs' five response briefs [Doc. 202]. Plaintiffs submitting the *Chesney* brief have filed a supplemental brief [Doc. 262], to which TVA has filed a response [Doc. 270].

---

[2]Plaintiffs submitting the *Turner* brief also adopt and incorporate the response briefs of the other plaintiffs.

[3]Plaintiffs submitting the *Armes* brief also adopt and incorporate the response briefs of the other plaintiffs. Plaintiffs in *Chamberlain, et al. v. TVA*, Case No. 3:09-CV-602, *Troutt, et al. v. TVA*, Case No. 3:09-CV-603, *Brown, et al. v. TVA*, Case No. 3:09-CV-604, and *Rose, et al. v. TVA*, Case No. 3:09-CV-605, have filed a notice adopting the *Armes* brief [*See Armes*, Doc. 37]

[4]Plaintiff submitting the *Mays* brief also adopts and incorporates the response briefs of the other plaintiffs, to the extent such briefs do not conflict with the *Mays* brief. Plaintiffs in *Rivers, et al. v. TVA*, Case No. 3:09-CV-572, have filed a notice adopting the *Mays* brief [*See Mays*, Doc. 101].

[5]Plaintiffs submitting the *Daugherty* brief also adopt and incorporate the response briefs of the other plaintiffs.

Plaintiffs in *Sandlin et al. v. TVA*, Case No. 3:09-CV-594, and *Powers et al. v. TVA*, Case No. 3:09-CV-595, have filed a notice adopting the response briefs of the other plaintiffs [*See Sandlin*, Doc. 40].

For the reasons stated herein, TVA's motions will be **GRANTED in part** and **DENIED in part**.

## I.     Relevant Factual and Procedural Background[6]

Plaintiffs filed the above-captioned cases against TVA following the dike failure and coal ash spill at the KIF plant on December 22, 2008.[7]  In the complaints, plaintiffs allege that they reside, own property, and/or own businesses within the vicinity of the ash spill. While not identical, the complaints assert similar allegations and tort law causes of action—*e.g.*, negligence, negligence per se, gross negligence, trespass, nuisance, and strict liability.  Several plaintiffs request that TVA be ordered to fund medical monitoring and several plaintiffs allege claims for inverse condemnation.   Plaintiffs are seeking compensatory damages and/or injunctive relief.

In April 2009, TVA filed motions to dismiss or for summary judgment on grounds that the federal discretionary function doctrine applies to TVA and requires dismissal or summary judgment of all plaintiffs' tort claims ("the discretionary function motions") [*see* Doc. 46].  Following the filing of the discretionary function motions, various entities released reports about the dike failure and ash spill.  Both plaintiffs and TVA have filed these reports in the records of these cases and the parties have cited the reports and discussed each

_____

[6]For background on the KIF plant and the December 22, 2008 dike failure and coal ash spill, please *see Mays v. TVA*, 699 F. Supp. 2d 991 (E.D. Tenn. 2010).

[7]Plaintiffs in *Chesney* have also alleged claims against WorleyParsons Corporation and Geosyntec Consultants, Inc., professional engineering contractors who provided engineering consultant services and/or advice to TVA at various times from 2004 through 2007.  These defendants have filed a separate motion to dismiss or motion for summary judgment [*see* Doc. 203].

throughout this litigation, including in the briefs presently before the Court. Because the reports are the subject of much discussion in the parties' briefs and are cited and referred to by both plaintiffs and TVA, the Court will discuss the findings of these reports in section III, subsection C, of this opinion.

On March 26, 2010, following briefing by plaintiffs and TVA, the Court ruled on TVA's discretionary function motions (the "*Mays* opinion"), finding that the discretionary function doctrine applies to TVA and protects TVA's conduct that was grounded in considerations of public policy and involved the permissible exercise of policy judgment. *See Mays v. TVA*, 699 F. Supp. 2d 991, 1016, 1019 (E.D. Tenn. 2010). The Court also found, however, that plaintiffs had challenged conduct apart from TVA's protected policy decisions. *Mays*, 699 F. Supp. 2d at 1022.

On February 19, 2010, the plaintiff in *Crichton v. TVA* filed a motion for summary judgment as to TVA's liability, asserting that there were no genuine issues of disputed material fact in regard to whether TVA's improper maintenance caused the dike failure and ash spill and resulted in harm to the *Crichton* plaintiff [*Crichton*, Case No. 3:09-CV-592, Doc. 20]. The Court denied the *Crichton* plaintiff's motion for summary judgment on June 15, 2010 (the "*Crichton* opinion") [*Id.*, Doc. 58]. *See Crichton v. TVA*, No. 3:09-CV-592, 2010 WL 2484193 (E.D. Tenn. Jun. 15, 2010).

On July 16, 2010, TVA filed the Nondiscretionary Conduct Motions.

## II.     Standard of Review

A court may grant summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). The Court views the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Liberty Lobby*, 477 U.S. at 248.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Liberty Lobby*, 477 U.S. at 250. The Court does not weigh the evidence

or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250.

## III.   Analysis

### A.     Plaintiffs' Requests for Additional Time for Discovery

The Court first turns to plaintiffs' requests for additional time to engage in discovery prior to the Court's ruling on the Nondiscretionary Conduct Motions. Plaintiffs in *Turner* and *Armes* assert that TVA's motions are premature because certain depositions have not taken place and they anticipate "additional evidence, expert testimony, and lay testimony that will further support their claims." [*Turner*, Doc. 45, p. 8; *Armes*, Doc. 36, p. 20]. TVA opposes plaintiffs' requests.

When a summary judgment motion is filed, the party opposing the motion may, by affidavit under Rule 56(f), explain why he or she is unable to present facts essential to justify the party's opposition to the motion. *See* Fed. R. Civ. Pro. 56(f); *Wallin v. Norman*, 317 F.3d 558, 564 (6th Cir. 2003). "The burden is on the party seeking additional discovery to demonstrate why such discovery is necessary." *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004). Bare allegations or vague assertions of the need for additional time for discovery are not enough. *United States v. Cantrell*, 92 F. Supp. 2d 704, 717 (S.D. Ohio 2000) (citing

*Lewis v. ACB Business Serv., Inc.*, 135 F.3d 389, 409 (6th Cir. 1998)). The U.S. Court of Appeals for the Sixth Circuit has found that a party must make such a request with "'some precision" and must state "the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment.'" *Summers*, 368 F.3d at 887 (quoting *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)). Plaintiffs in *Turner* and *Armes* have done neither.

The dike failure and ash spill occurred on December 22, 2008. It is now more than two years since the spill and the filing of the first cases. Neither the clean-up nor discovery in these cases has yet been completed, but both have been ongoing since the filing of the first case. In addition, all discovery has been made available to all parties. Further, after TVA filed the Nondiscretionary Conduct Motions, plaintiffs requested and were granted extensions of time to file responses to TVA's motions [Doc. 182].[8]

In regard to plaintiffs' present requests for additional time, the Court notes that no supporting affidavits have been filed explaining why plaintiffs are unable to present facts essential to plaintiffs' opposition arguments or explaining why specific discovery is necessary. To the extent plaintiffs rely on the affidavit filed on June 29, 2010 by Mr. Ryan C. Edens, counsel for plaintiffs in *Turner* [*Turner*, Doc. 39-1], the Court has reviewed that affidavit and finds that it neither specifies with sufficient precision what plaintiffs hope to obtain with further discovery, nor describes how such discovery would help plaintiffs in

---

[8]The Court also granted additional time to plaintiffs who requested more time beyond the initial extension.

opposing TVA's motions. While the Court agrees that discovery in this litigation is indeed substantial, in light of the amount of time plaintiffs have had to review the discovery, the extensions of time allowed, the absence of sufficient affidavits, and because the Court has been presented with no other reason for determining that TVA's motions are premature, plaintiffs' requests for additional time to conduct discovery prior to the Court's ruling are **DENIED**.

### B.       The *Mays* and *Crichton* Opinions

The Court will now review the *Mays* and *Crichton* opinions to properly frame the issues before the Court and because the parties' briefings on the Nondiscretionary Conduct Motions should be considered in the context of those opinions. In *Mays*, the Court observed that "[t]he nature of the decisions giving rise to the various types of conduct challenged by Plaintiffs no doubt involved elements of choice and judgment." *Mays*, 699 F. Supp. 2d at 1019. The Court found that some of the conduct challenged by plaintiffs was protected by the discretionary function doctrine because the conduct was clearly grounded in considerations of public policy and involved the permissible exercise of policy judgment. *Id*. The Court found this protected conduct to include: TVA's decisions regarding the KIF plant's location, design, and manner of construction; TVA's decisions as to what polices and procedures governed coal ash disposal; TVA's decisions regarding modifications or redesigns of the KIF plant; and TVA's decisions as to whether to continue operating the KIF plant as a wet coal ash storage facility. *Id.* at 1019, 1020-22. The Court did not determine "whether the choices and judgments inherent in *all [TVA's] relevant decisions* were

grounded in considerations of public policy." *Id.* at 1019 (emphasis added). Accordingly, the Court recognized that plaintiffs had challenged conduct apart from the aforementioned policy decisions and concluded that TVA was not protected by the discretionary function doctrine to the extent plaintiffs' had made allegations regarding:

> Neglect of the facilities, neglect of day-to-day maintenance, ignoring policies and procedures, failing to implement corrective measures or modifications under those policies or procedures, and the failure to have in place policies and procedures[.]

*Id.* at 1022. The Court found these allegations did not arise out of "discretionary decisions involving the permissible exercise of policy judgment and consideration of public policy." *Id.* Importantly, the Court did not inquire into and did not give any determination regarding the causes, root or otherwise, of the dike failure. Moreover, the Court did not find any cause or causes of the dike failure to be "undisputed."[9]

In the *Crichton* opinion, the Court considered the plaintiff's argument that there was no genuine issue of material fact that TVA's improper maintenance caused the dike failure and harmed the plaintiff. *Crichton*, 2010 WL 2484193, at *3, *8. The *Crichton* plaintiff, who filed his motion for summary judgment prior to the Court's issuance of the *Mays* opinion, based his arguments almost entirely on a report by TVA's Office of Inspector General (the "OIG"), titled, the Review of the Kingston Fossil Plant Ash Spill Root Cause

---

[9]While the Court described the findings of the reports, the Court did not accept such findings as undisputed. Rather, the Court gave a short description of the reports because "both TVA and Plaintiffs discuss[ed] [the] . . . reports in their respective briefs, and because such reports [were] relevant to the issues addressed by both parties[.]" *Mays*, 699 F. Supp. 2d at 999.

Study and Observations About Ash Management (the "OIG report") [*Turner*, Doc. 46-2].

After thoroughly considering the *Crichton* plaintiff's allegations and the contents of the OIG report, the Court found that "[w]hether TVA was negligent . . . will necessarily be a fact intensive inquiry and will require more detailed factual allegations and evidence than that stated and cited in plaintiff's brief." *Crichton*, 2010 WL 2484193, at *8. The Court found the OIG report relevant to the plaintiff's claims and allegations but not determinative of liability because there remained genuine issues of material fact.

Plaintiffs in *Turner*, *Armes*, and *Mays* assert that the Court has previously ruled on the substance of TVA's present summary judgment requests. These plaintiffs assert that the *Mays* opinion addressed TVA's present requests "to the extent Plaintiffs' tort claims pertain to TVA's use, maintenance and upkeep of the Swan Pond facilities." [*Armes*, Doc. 35 (citing *Mays*, 699 F. Supp. 2d at 1020)]. The Court disagrees.

In the *Mays* opinion, the Court concluded that some conduct by TVA was shielded by the discretionary function doctrine and some was not. *See Mays*, 699 F. Supp. 2d at 1022. Because the record of the cases at the time of the *Mays* opinion contained genuine issues of material fact as to what type of alleged conduct by TVA was nondiscretionary and what type of nondiscretionary conduct allegedly caused the dike failure and spill, the Court granted in part and denied in part TVA's requests for summary judgment. A similar situation occurred in the context of the *Crichton* case. Furthermore, the *Crichton* plaintiff never supplemented his motion or incorporated the Court's findings and conclusions in the *Mays* opinion into his argument for summary judgment. The Court, therefore, had before it no arguments or

evidence from the *Crichton* plaintiff incorporating the findings or holding of the *Mays* opinion.[10] Consequently, the effect of the *Crichton* opinion on TVA's present summary judgment requests is minimal.

Given the foregoing, the Court disagrees with plaintiffs that the Nondiscretionary Conduct Motions and the summary judgment requests contained therein are inappropriate in light of the Court's prior rulings.

### C.    The Coal Ash Spill Reports

In January 2009, TVA commissioned AECOM Technology Corporation, an engineering consultant firm, to study the physical root causes of the December 22, 2008 dike failure and ash spill and to produce a report on its findings [*Turner*, Doc. 46-3]. The Executive Summary for the Root Cause Analysis of Kingston Dredge Cell Failure (the "AECOM report"), released on June 2009, was the result of that study [*Id.*]. AECOM also contacted with Dr. Gonzalo Castro, P.E., an engineering consultant, to perform an independent peer review of AECOM's work [*Id.*]. The AECOM report concludes that four concurrent factors were the most probable root causes for the failure of the containment dike: (1) an increased load on the dike due to the higher elevation of the ash stack and the continued use of the facilities at the KIF plant for coal ash disposal; (2) the setback of the dredge cell dike from the outer containment dike which placed the dredged cell dike over a

---

[10]It should be noted that TVA submitted its response to the *Crichton* plaintiff's motion *after* the Court's issuance of the *Mays* opinion [*see Crichton*, Doc. 53]. Thus, TVA's response brief incorporated the Court's findings in the *Mays* opinion regarding the application of the discretionary function doctrine to this litigation, while the *Crichton* plaintiff's brief did not.

wet ash foundation; (3) an unusually weak silt/ash "slimes" layer at the bottom of the wet ash foundation; and (4) a lack of consolidation of the wet ash underlying the dredge cell dike leading to the potential for static liquefaction [*Id.*, p. 35].

Following the issuance of the AECOM report, TVA's OIG hired Marshall Miller and Associates, Inc. ("Marshall Miller"), an engineering consultant firm, to conduct an independent peer review of AECOM's root cause analysis [*See Turner*, Doc. 46-4]. The result of that review, issued in July 2009, was Marshall Miller's AECOM Root Causes Analysis of TVA Kingston Dredge Pond Failure on December 22, 2008 (the "Marshall Miller report") [*Id.*]. The Marshall Miller report found "reasonable" the AECOM report's "generalized potential failure sequence" about the dike failure [*Id.*, pp. 14, 18]. The report also found that the AECOM report's "fundamental conclusions . . . with regard to the four most probable root causes or factors contributing to the Kingston ash pond failure were technically plausible and reasonably supported by the study data[,]" and that these factors "contributed significantly to the failure." [*Id.*]. The report noted, however, that "the role of the loose, wet ash as a root cause of the failure can not be discounted" and that the characteristics of the loose, wet ash was "a probable root cause of equal or greater significance to the soft foundation soils . . . ." [*Id.*]. The Marshall Miller report found that the dike failure was "not strictly associated with the 'thin, weak slimes' layer and was more associated with the ash dike (or 'fill') geometry and relatively low strength of the sluiced ash foundation and impounded material." [*Id.*, pp. 18-19].

TVA's OIG reviewed the findings of the Marshall Miller report, along with prior stability analyses by TVA employees and consultants [*Turner*, Doc. 46-2]. The OIG report, issued on July 23, 2009, was the result of those reviews [*Id.*, p. 5]. The OIG report concurs with the AECOM report's conclusions regarding the four most probable root causes. The OIG report is critical, however, of TVA's decision to limit AECOM's scope of work to a root cause analysis [Doc. 192-1, p. 48].[11] The OIG report states that the AECOM report failed to acknowledge or report on management practices at the KIF plant and how such practices may have contributed to the dike failure and spill [*Id.*]. The OIG report summarized its findings as follows:

> Based upon our review, we find that: (1) AECOM's focus on the "slimes" layer is misplaced; (2) TVA could have possibly prevented the Kingston Spill by implementing recommended corrective measures; (3) "red flags" existed for years that raised risks that were not captured by TVA's Enterprise Risk Management Program; and (4) the culture within TVA's fossil fuel plants resulted in coal ash being treated like garbage at a landfill rather than treating it as a potential hazard to the public and the environment.

[*Id.*].

Another report discussed and cited by plaintiffs is the Report to the Board of Directors of the Tennessee Valley Authority Regarding Kingston Factual Findings, by R. William Ide III and Joseph O. Blanco of the McKenna Long & Aldridge law firm (the "McKenna Long

---

[11]The Marshall Miller report states that the scope of AECOM's work was limited to the "identification of the likely initiator(s) ('root cause(s)') of the failure, which, according to AECOM, inherently encompasses consideration of potential failure modes, possible 'initiators" or 'triggers' of the onset of failure, and factors that contributed to its progression or propagation." [*Turner*, Doc. 46-4, p. 8].

report") [Doc. 192-2, p. 19]. The scope of the McKenna Long report, issued on July 21, 2009, was the need "to provide a basis . . . to improve TVA's governance, systems and controls to reduce the likelihood of similar or other harmful incidents that could be prevented by improvements to systems and controls by setting performance expectations." [*Id.*, p. 20]. The Marshall Miller report considers TVA's management of coal ash storage systems, most specifically, the system at the KIF plant, and concludes that "the necessary systems, controls, standards, and culture were not in place[]" and that the KIF plant had the following problems: lack of clarity and accountability for ultimate responsibility; lack of standardization and training and metric; siloed responsibilities and poor communication; lack of checks and balances; lack of prevention priority and resources; and reactive instead of proactive "fixes" [*Id.*, pp. 20-22]. The McKenna Long report concludes that "storage needs [drove] risk decisions" in the construction of the KIF plant and its facilities and that TVA's management of the ash pond was fragmented [*Id.*, pp. 22, 30].

Plaintiffs have also discussed a report by the Tennessee Department of Environment and Conservation (the "TDEC") Advisory Board, titled, Lessons Learned from the TVA Kingston Dredge Cell Containment Facility Failure, Recommendations for Safe Performance (the "TDEC report") [Doc. 192-2, p. 1]. The TDEC report, issued on November 30, 2009, evaluates safety procedures, engineering design guidelines, and proper construction compliance at the KIF plant and similar plants [*Id.*, p. 3]. The goal of the TDEC report was to "develop an understanding of the methods utilized by TVA in determining the causes of failure at Kingston and the conditions" at similar plants and to "establish lessons learned

from the [failure] and develop[] recommendations for safety at other plants" [*Id.*, pp. 3-5]. The report limited its findings by stating that a "[d]etermination of the exact cause of the Kingston failure is not the responsibility of the Advisory Board." [*Id.*, p. 4]. The TDEC report found a lack of engineering principles at the KIF plant concerning the "evolutionary process of the construction" and found that no consistent "design evaluation, documentation, and communication" managed the evolutionary process [*Id.*, p. 5]. The TDEC report also found that the following areas could be improved at the KIF plant: the inspection process; qualifications for inspectors; emergency response; operation and maintenance; and engineering analyses [*Id.*, p. 7].

In addition to the reports discussed above, plaintiffs have submitted: (1) a declaration [Doc. 192-3] and affidavit [Doc. 192-4] by Gary R. Brown, P.E., an expert environmental engineer (the "Brown declaration" and the "Brown affidavit"); (2) an affidavit [*Turner*, Doc. 46] by Dennis Allen Huckaba, P.E., an expert civil engineer (the "Huckaba affidavit"); and (3) an affidavit [Doc. 192-1] by Belve Dansby Marks, Ph.d, P.E., an expert geo-technical engineer (the "Marks affidavit").

### D. Nondiscretionary Conduct

TVA asserts that plaintiffs have not shown, with reasonable specificity, that any nondiscretionary act or omission by TVA caused the dike failure and ash spill. Plaintiffs disagree and assert that the dike failure and ash spill were not solely a result of TVA's policy decisions that are protected by the discretionary function doctrine because TVA engaged in patterns of negligent, nondiscretionary conduct that caused and contributed to the dike

15

failure.[12]  Plaintiffs assert that the record of these cases and the submitted evidence—the affidavits and declarations, the coal ash spill reports, testimony from TVA employees, stability analyses, dike inspection reports, seepage reports, and recommended repairs and modifications—demonstrate that nondiscretionary, negligent conduct by TVA caused and contributed to the dike failure and spill.  The plaintiffs in *Chesney* assert that the most probable root causes of the dike failure are disputed and they argue that TVA has overemphasized any consensus around the probable root causes.  In addition, the plaintiff in *Mays* asserts that summary judgment is inappropriate for any private nuisance claims.

In the *Mays* opinion, the Court observed that:

> In the years prior to the coal ash spill, TVA made a policy decision, grounded in considerations of public policy, to have a wet coal ash storage and disposal facility.  In conjunction with this overarching policy decision, TVA made a series of policy decisions regarding where to locate the coal ash disposal facilities and the design and construction of the facilities.  TVA also made policy decisions after the Swan Pond facilities were in operation as to what polices and procedures would govern the coal ash disposal, decisions such as whether to implement modifications or changes to the facilities and whether to continue disposing of the coal ash with a wet storage system.  Several of Plaintiffs' tort claims, however, challenge conduct apart from these policy decisions.
>
> . . . .

---

[12]As indicated above, plaintiffs have submitted five response briefs in opposition to TVA's motions, with plaintiffs adopting and/or incorporating the responses and related filings of other plaintiffs. Many of the legal and factual arguments in plaintiffs' responses, along with the submitted evidence, are substantially similar, if not identical.  The Court will, therefore, discuss and address plaintiffs' responses together.  To the extent certain plaintiffs have brought additional arguments or addressed issues unique to their cases, the Court will note as such and address these issues separately.

> Neglect of the facilities, neglect of day-to-day maintenance, ignoring polices and procedures, failing to implement corrective measures or modifications under those policies and procedures, and the failure to have in place policies and procedures, are not discretionary decisions involving the permissible exercise of policy judgment and consideration of public policy. Thus, the Court concludes that this type of conduct by TVA is not shielded by the discretionary function doctrine.

*Mays*, 699 F. Supp. 2d at 1019, 1022. In the response briefs, plaintiffs have sought to specifically identify what constitutes nondiscretionary "conduct apart" from TVA's discretionary policy decisions. Upon review of plaintiffs' responses, the Court has deduced the following categories that encompass conduct plaintiffs allege to be nondiscretionary acts or omissions by TVA that caused or contributed to the dike failure and ash spill:

(1)     Coal ash operation and management practices;

(2)     Construction, modifications, and repairs;

(3)     Daily maintenance.

### 1.     Coal Ash Operation and Management Practices

Plaintiffs allege that TVA did not have appropriate or comprehensive policies and procedures for coal ash operations, management, and oversight. Quoting the OIG report, plaintiffs assert that TVA personnel were unable to identify "any policies and procedures dealing with the storing, handling, and maintaining of ash and ash facilities" and TVA's failure to have such policies and procedures was negligent in light of national and international standards for dam safety [Doc. 192, pp. 13-14 (citing *Turner*, Doc. 46-2, p.

32)].[13]   Plaintiffs assert that TVA's operational policies and procedures, if any, were characterized by poor communication, "fragmented" and "siloed" responsibilities, and a "complete" lack of standardization, training, and metrics [Doc. 192, pp. 13-14 (citing Doc. 192-2, pp. 14-16, 18-22; *Turner*, Doc. 46-2, p. 32); Doc. 192-1, ¶ 320].   For example, plaintiffs assert that TVA used an outdated design guide for performing static slope stability analyses on the containment dikes [Doc. 192, p. 18 (citing *Turner*, Doc. 46-2, pp. 32, 36-37); Doc. 192-1, ¶ 32]; TVA did not have effective ash handling manuals; and TVA did not collect and monitor water levels even though the data was readily available [Doc. 192, pp. 18-19; Doc. 192-1, ¶ 9; Doc. 192-4].

Plaintiffs also assert that inspection programs at the KIF plant were inadequate because TVA personnel were not properly trained and had no systematic procedures to follow [Doc. 192, pp. 20-21 (citing *Turner*, Doc. 46-2, p. 34; Doc. 192-1, ¶¶ 13-15, 21-23)]. Plaintiffs assert that the combination of inadequate inspections and untrained personnel resulted in "cursory inspections" and "cut and paste" annual reports which made adequate day-to-day maintenance impossible and prevented TVA from monitoring the dikes and the coal ash storage impoundment for signs of deterioration or safety problems [Doc. 192, p. 20; Doc. 192-1, ¶¶ 18-19].   Plaintiffs also assert that TVA did not make prevention measures a

---

[13]As an example of one such safety standard, the *Chesney* brief asserts that TVA negligently refused to follow the policies and procedures embodied in the National Dam Safety Program for the management of embankments [Doc. 192, pp. 13-14; Doc. 192-1, ¶¶ 31-44].

priority and did not commit the necessary resources and personnel required for routine maintenance [Doc. 192, p. 22 (citing Doc. 192-2, pp. 23-24)].

## 2. Construction, Modifications, and Repairs

Plaintiffs also allege that a lack of oversight of on-going dike construction resulted in containment and storage facilities that deviated from approved design drawings. They allege that TVA failed to follow best engineering practices because it did not perform construction quality assurance and control on the plant and its facilities [*see* Doc. 192, pp. 16-19 (citing Doc. 192-2, pp. 16-18; *Turner*, Doc. 46-2, pp. 36-37)]. Plaintiffs assert that TVA personnel "openly admitted to deviating from drawings at their personal discretion," and failed to create "as-built" or "record" plans [Doc. 192, pp. 16-17 (citing *Turner*, Doc. 46-2, pp. 36-37)]. Plaintiffs assert that TVA's conduct made it difficult to account for "shoddy construction" and "deviations" from approved plans and that despite being aware of intrinsic problems, TVA took no actions [Doc. 192, pp. 17-22 (citing *Turner*, Doc. 46-2, p. 22, 36-37; Doc, 192-1, ¶ 52; Doc. 192-2, p. 16)]. As an example, plaintiffs assert that there were intrinsic stability problems at Dike C because it was not built according to specifications in approved design drawings. Plaintiffs assert that TVA made no changes to Dike C despite an engineer's advice and recommendation that Dike C be closely monitored and that upstream embankments be modified in accordance with a specified design [Doc. 192, pp. 16-17; Doc. 192-1, ¶ 51; *Turner*, Doc. 46-2]. Plaintiffs also assert that there is no explanation for why TVA did not follow approved design plans at the location of blowout areas [Doc. 192, p. 17 (citing Doc. 192-3, ¶ 11)]. Finally, plaintiffs assert that TVA did not monitor whether the

type of bottom and fly ash used at the KIF plant was consistent with the type of ash required by the approved plans [Doc. 192, p. 17; Doc. 192-2, p. 17].

Plaintiffs also allege that TVA did not use the best information available when it constructed modifications and expansions at the KIF plant and that this resulted in dike instability [Doc. 192, p. 18 (citing Doc. 192-4)].  Plaintiffs also assert that TVA failed to follow best engineering practices when conducting necessary repairs following blowouts and that TVA followed a short-sighted "reactive" approach to repairs that "ultimately overwhelm[ed] the foundations of the impoundment slopes." [Doc. 192, p. 19 (citing Doc. 192-4, ¶ 2); *see also* Doc. 192-2, pp. 35-36].  Finally, plaintiffs assert that although TVA indicated it would install piezometers (observation wells) to monitor the adequacy of repairs, TVA never installed the piezometers in the location of the dike failure and the piezometers that were installed were either not monitored or were destroyed by mowing activities [Doc. 192, pp. 19-20 (citing Doc. 192-3, ¶ 10; Doc. 192-1, ¶ 28)].

### 3.    Daily Maintenance

Plaintiffs also allege that for a period "spanning years," TVA neglected daily maintenance of the ash pond and "critical components of embankments impounding the coal ash." [Doc. 192, p. 21 (citing Doc. 192-1, ¶¶ 24-30)].  Citing the OIG report, plaintiffs assert that TVA has no records of daily maintenance and that "erosion, seepage, overgrown vegetation, sparse vegetation, tree growth on dikes, standing water, and water drainage piping issues" at the KIF plant are examples of identifiable signs of neglect representative of TVA's lack of general maintenance [Doc. 192, pp. 21-22 (citing *Turner*, Doc. 46-2, pp.

32-22)]. Finally, plaintiffs assert that TVA's lack of daily maintenance, coupled with cursory annual inspections by untrained personnel, made it impossible for TVA to monitor and maintain key features of the dikes and the coal ash facilities [Doc. 192, p. 21-22 (citing Doc. 192-1, ¶¶ 29, 27)].

E.    TVA's Reply

TVA asserts that plaintiffs have merely made conclusory allegations that TVA and its consultants performed inadequate inspections and produced and used substandard documentation of the KIF plant and its surface physical conditions.  TVA argues that these allegations cannot defeat TVA's requests for summary judgment because it is undisputed that the most probable root causes of the dike failure were TVA's discretionary decisions regarding the design of the coal ash storage facilities and TVA's plans for constructing the coal ash stack through the hydraulic placement of coal ash.  TVA asserts that the undisputed findings of the AECOM report show that it was a foundation failure below the surface of the coal ash storage facilities, not the physical conditions of the surface, that caused the dike failure.  TVA also asserts that plaintiffs have merely speculated that better inspections would have revealed the potential for dike failure and such speculations do not explain how negligent maintenance, inadequate inspections and monitoring, and the substandard physical conditions of the containment dikes caused or contributed to the dike failure.  TVA asserts that the facilities at the KIF plant were inspected by TVA personnel, TDEC inspectors, and two independent engineering firms, and that none of these inspectors concluded that subsurface conditions might cause a catastrophic failure.  In addition, TVA asserts that

plaintiffs have not submitted any evidence or descriptions supported by factual explanations or engineering analysis as to the physical mechanics of causation between plaintiffs' allegations of nondiscretionary conduct and the dike failure. TVA argues that the failure to do so is fatal to plaintiffs' claims because it is not within the knowledge of lay persons that better surface inspections by better engineers could have detected the potential for catastrophic subsurface failure.

F. **The Existence of Genuine Issues of Material Fact as to Whether Nondiscretionary Conduct by TVA Caused the Dike Failure and Coal Ash Spill**

In the *Mays* opinion, the Court discussed at length the discretionary function doctrine analysis and its application to this litigation. The Court will not go into such an extensive discussion again except as necessary to determine whether plaintiffs have raised a genuine issue of material fact as to whether nondiscretionary conduct by TVA caused the dike failure and ash spill.

The Court agrees with TVA's articulation of what plaintiffs must do to recover on their tort claims. That is, "[p]laintiffs must . . . identify a specific decision or conduct on the part of TVA and show it to be within the Court's determination of what may constitute a nondiscretionary act for which TVA may be liable[,]" and then explain how that decision or conduct caused the dike failure [Doc. 177, p. 4]. TVA asserts that plaintiffs cannot do this and cannot identify specific nondiscretionary conduct and explain how that conduct physically caused the dike failure.

The *Mays* opinion limited plaintiffs' allegations against TVA to those involving nondiscretionary conduct. The Court, therefore, begins by reiterating its previous finding that TVA cannot be liable for plaintiffs' allegations regarding TVA's design and construction plans and TVA's decision to keep operating the wet coal ash disposal system. TVA's conduct relating to these areas is protected by the discretionary function doctrine. *Mays*, 699 F. Supp. 2d at 1021-22. In addition, the Court notes that TVA cannot be liable for plaintiffs' allegations pertaining to TVA's clean-up, removal, or remediation conduct following the ash spill because this conduct is also protected by the discretionary function doctrine. *Id.* at 1022-23. Thus, to the extent plaintiffs continue to assert these types of allegations, such are precluded by the discretionary function doctrine and TVA's requests for summary judgment are **GRANTED** as to these allegations.

### 1. Coal Ash Operation and Management Practices

The Court now turns to plaintiffs' allegations that TVA was negligent in failing to have appropriate and comprehensive policies and procedures for coal ash operations, management, and oversight. In its reply brief, TVA states that "[i]t is clear that TVA had in place policies and procedures" at the KIF plant and that plaintiffs have not argued that none were in effect [Doc. 202, p. 1 n.1].[14] The Court, however, finds plaintiffs' allegations to encompass more than TVA indicates. In addition to alleging that TVA lacked

---

[14]TVA asserts that "[i]t is clear that TVA had in place various policies and procedures for the [KIF plant] (*e.g.,* Operations Manual, Inspection Procedures, Ash Management Instructions)[.]" [Doc. 202, p. 1 n.1].

comprehensive policies and procedures, plaintiffs have alleged that TVA personnel were unable to identify any policies and procedures and that TVA personnel were not properly trained on how to perform inspections. Such conduct, plaintiffs assert, culminated in cursory and inadequate inspections and annual reports which made it impossible for TVA to address safety and maintenance issues that ultimately caused or contributed to the dike failure and ash spill.

As the Court has previously stated, "decisions after the [KIF plant facilities] were in operation as to what policies and procedures would govern the coal ash disposal" are policy decisions and therefore discretionary. *Mays*, 699 F. Supp. 2d at 1019. While these decisions may have resulted in operational policies and procedures that were not comprehensive or were otherwise inappropriate, "[e]ven the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made." *Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir. 1986), *cert. denied*, 480 U.S. 948 (1987). *Myslakowski* involved tort claims brought under the Federal Tort Claims Act and against the government for injuries the plaintiffs sustained following an accident in a vehicle formerly owned by the U. S. Postal Service. *Myslakowski*, 806 F.2d at 94-95. The government asserted that it was entitled to immunity under the discretionary function doctrine for plaintiff's claims that it acted negligently by selling the vehicle to the public and failing to affix proper warnings on it. *Id.* at 95. The district court concluded that the government's decision to sell the vehicle was discretionary, but the government's decision not to warn subsequent purchasers of the

vehicle's rollover risk was not. *Id.* at 96-96. The court of appeals disagreed, stating that the district court erred in finding there to be no discretionary decision because there was no evidence the government had evaluated the pros and cons of placing a warning on the vehicle. *Id.* at 97. The court of appeals observed that the fact that the government may or may not have evaluated all or even some of the dangers associated with the decision, and may not have given any thought to the matter, "is not to say that the considerations unaddressed are therefore outside the ambit of the discretionary judgment exception to the statute and a basis for establishing tort liability." *Id.* The court of appeals then noted that a purpose of the discretionary function doctrine is:

> [I]n part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical, matters in discretionary decision[-]making . . . . If it were otherwise, a judgment-based policy determination made at the highest levels, to which all would concede that the statutory exception applies . . . would result in no immunity if the decision could be shown to have been made without consideration of important, relevant factors, or was a decision negligently reached. If that reasoning were sound, the discretionary function exception would be inapplicable in every case in which a negligent "failure to consider" a relevant risk could be proved.

*Id. See, e.g., In re Ohio River Disaster Litig.*, 862 F.2d 1237, 1247-48 (6th Cir. 1988) (noting that, even though a decision by government personnel not to override a decision made by lower-ranking personnel "may or may not have been made by considering all of the pros and cons[,]" that decision was not for a court to second-guess because it involved oversight control and deciding whether or not to override another decision).

Plaintiffs in these cases have challenged the substance and comprehensiveness of TVA's decisions regarding what policies and procedures would govern coal ash disposal at the KIF plant. The process of arriving at decisions of this type necessarily involves policy considerations and the balancing of numerous factors including, among others, consideration of the treatment of the coal ash given the particular area and type of facility, the skill level, type, and number of TVA personnel responsible for carrying out the policies and procedures, budgetary and technical concerns, and the consideration of various national, state, and local guidelines and regulations. Similar to the situation presented in *Myslakowski*, even if TVA ignored risks relevant to dam safety and failed to consider standards for dams or hazardous and non-hazardous materials, the discretionary function doctrine shields these decisions because each involves the weighing and considering of policy considerations, even if certain factors were ignored or were not properly considered. Accordingly, to the extent plaintiffs have challenged the substance or comprehensiveness of TVA's coal ash policies and procedures, plaintiffs cannot do so because of the protection afforded by the discretionary function doctrine. *See United States v. Gaubert*, 499 U.S. 315, 325 (1991) (stating that discretionary decisions may involve "[d]ay-to-day management" type decisions, such as those that "regularly require[] judgment as to which of a range of permissible courses is the wisest[]"). Accordingly, TVA's requests for summary judgment are **GRANTED** as to these allegations.

The Court finds, however, that plaintiffs' allegations that TVA failed to inform or train its personnel in applicable policies and procedures involve nondiscretionary conduct.

Negligent failure to perform a policy decision—such as a failure to provide information and training to employees and/or inspectors for carrying out pre-determined policies and procedures for coal ash operation and management—would not involve the same policy judgments as the actual creation of those policies and procedures. *See, e.g. In re Ohio River Disaster Litig.*, 862 F.2d at 1246 (agreeing with the district court's finding that the Army Corps of Engineer's failure to conduct periodic inspections and failure to properly train personnel involved nondiscretionary conduct); *Reminga v. United States*, 631 F.2d 449, 452 (6th Cir. 1980) (holding that the discretionary function doctrine did not apply to the government's negligent preparation of a navigational chart because once having exercised the discretion to issue navigational charts, the government is accountable for its negligence in failing to locate hazards accurately on the charts). Accordingly, plaintiffs' allegations that TVA negligently failed to train or inform TVA personnel about the applicable policies and procedures and plaintiffs' allegations that TVA personnel negligently and/or inadequately performed such policies and procedures are allegations involving nondiscretionary conduct and TVA's requests for summary judgment are **DENIED** as to these allegations.

### 2. Construction, Modifications, and Repairs

The Court now turns to plaintiffs' allegations that TVA was negligent in its construction, modifications, and repairs to the KIF plant.

In *Shepherd v. United States*, the plaintiffs brought negligent design and maintenance claims against the Forest Service after they were involved in an accident on a road and bridge owned and maintained by the Forest Service. No. 2:08-CV-188, 2010 WL 1838640, at *8

(E.D. Tenn. May 6, 2010).  The plaintiffs alleged that the Forest Service was "negligent in failing to properly maintain the road and bridge . . . by not adequately designing the road and bridge to prevent vehicles from running off the bridge either by designing speed bumps and curves or by banking the entrance to the bridge."  *Shepherd*, 2010 WL 1838640, at *8.  The *Shepherd* court dismissed the plaintiffs' negligent design claim as protected by the discretionary function doctrine.  *Id.*  The *Shepherd* court also dismissed the plaintiffs' negligent maintenance claim because it found "conclusory" the plaintiffs' assertion that the Forest Service had a "duty to 'maintain the road and bridge in question by [ ] adequately designing the road and bridge to prevent vehicles from running off the bridge either by designing speed bumps and curves or by banking the entrance to the bridge.'" *Id.*  According to the *Shepherd* court:

> One cannot maintain something that was never actually designed or put into place.  Thus, the plaintiffs have not alleged a breach of a duty to maintain, for there were no structures, i.e., speed bumps, curves, or banking, to actually maintain.

*Id.*

In *Baum v. United States*, the plaintiffs were injured when their vehicle penetrated a guardrail on a bridge in a government park and fell to a roadway below.  986 F.2d 716 (4th Cir. 1993).  The plaintiffs sued the Park Service, arguing that it had "negligently maintained the guardrail system in the years preceding [the] accident."  *Baum*, 986 F.2d at 722.  The U.S. Court of Appeals for the Fourth Circuit found that the plaintiffs' negligent maintenance claims were barred by the discretionary function doctrine because:

> [N]owhere have [the plaintiffs] suggested that the allegedly defective
> condition of the guardrail system could have been remedied by any
> action short of outright *replacement* of the cast iron posts.  Indeed, [the
> plaintiffs] appear not to dispute the government's assertion that the only
> act of maintenance that could have put the guardrail into compliance
> with current engineering standards is outright replacement.

*Id.* at 723.  The *Baum* court stated that "[t]here is no suggestion of deterioration of the posts, the [plaintiffs'] argument goes that they should not have been used in the first place.  Thus, there is really no question as to maintenance, the fault, if any, was in design and construction."  *Id.* at 723 n.3; *see also Terbush v. United States*, No. 1:02-cv-05509-SMS, 2010 WL 399136, at *6-*7 (E.D. Cal. Jan. 28, 2010) (finding that the plaintiffs' negligence allegations in regard to the maintenance of a wastewater management system were really a "re-labeling of . . . design and operation claims. . . .  Plaintiffs assert no deficiencies that reasonably could be categorized as anything commonly understood to be maintenance such as repair, replacement, or cleaning").

In these cases, plaintiffs allege that TVA should have made different decisions about modifications and repairs for the KIF plant, that TVA did not use the best information available to it when constructing modifications and expansions, and that TVA followed a short-sighted approach to repairs.  These allegations fall within the Court's previous finding that "decisions such as whether to implement modifications or changes to the facilities and whether to continue disposing of the coal ash with a wet storage system" are policy decisions and therefore discretionary.  *Mays*, 699 F. Supp. 2d at 1019.  As the Court noted in the *Mays* opinion, TVA's decision to design and construct the wet coal ash facilities should not be

viewed as a single design and planning decision made in 1951.[15]  Rather, TVA made a series of policy decisions over a number of years during which modifications and repairs to the KIF plant were considered, approved, rejected, and implemented.  While plaintiffs argue that these modifications and repairs caused and contributed to the failure of the containment dike on December 22, 2008, plaintiffs cannot challenge the underlying decisions because of the policy considerations and factors inherent in those decisions.  While the benefit of hindsight might indicate that TVA's decisions were poorly reached, it does not change the fact that the selection of appropriate modifications or fixes to the KIF plant are decisions involving not merely design and engineering decisions but judgment as to the balancing of various policy factors, such factors including whether to expand or reduce the capacity of the storage facility, various technical requirements, and what to repair or modify within the allocated budget.  Accordingly, TVA's conduct and decisions involving modifications, repairs, and changes to the KIF plant and the surrounding impoundment are also policy decisions protected by the discretionary function doctrine and TVA's requests for summary judgment are **GRANTED** as to these allegations.

Plaintiffs' allegations, however, are not limited to those concerning modifications and repairs.  Plaintiffs have also challenged TVA's adherence to and implementation of approved design and construction plans.  Plaintiffs have alleged that TVA deviated from certain plans, resulting in "deviations" from approved designs and "shoddy construction."  These

---

[15]"Construction of the KIF plant began . . . in 1951."  *Mays*, 699 F. Supp. 2d at 996.

allegations fall into what the Court identified in the *Mays* opinion as the "implementation" of policy decisions:

> [S]everal of Plaintiff's tort claims fall within the category of cases which address the actual implementation of a particular policy decision that is itself protected by the discretionary function doctrine. That is, once a government agency makes a policy decision protected by the discretionary function doctrine, the agency must then proceed with care in the implementation of that decision.

*Mays*, 699 F. Supp. 2d at 1019. Thus, similar to the Court's analysis in the preceding section, plaintiffs' allegations of TVA's negligence in the implementation of design and construction plans involve nondiscretionary conduct. Accordingly, TVA's requests for summary judgment are **DENIED** as to these allegations.

### 3.    Daily Maintenance

The Court now turns to plaintiffs' allegations that TVA was negligent in the daily maintenance of the KIF plant and the surrounding impoundment. In the *Mays* opinion, the Court stated that the discretionary function doctrine does not shield challenges to "neglect [and] negligence in . . . day-to-day maintenance and operation[.]" *Mays*, 699 F. Supp. 2d at 1019. In addition, and as recognized in *Shepherd* and *Baum*, negligent maintenance allegations and allegations of deterioration are not the type of acts or omissions shielded by the discretionary function doctrine. *See Shepherd*, 2010 WL 1838640, at *8; *Baum*, 986 F.2d at 723.

Plaintiffs' allegations of negligent maintenance of various components of the coal ash facilities, if true, do not appear to be the result of policy decisions involving the consideration

of policy factors. The alleged acts or omissions contributing or causing the alleged negligent maintenance would not be preceded by decisions balancing policy factors "based on the purposes" of the KIF plant and its wet coal ash disposal system.[16]  Accordingly, the Court finds plaintiffs' allegations of negligent maintenance resulting in "erosion, seepage, overgrown vegetation, sparse vegetation, tree growth on dikes, standing water, and water drainage piping issues" to involve nondiscretionary conduct and TVA's requests for summary judgment are **DENIED** as to these allegations.

### G.    Causation

TVA asserts that even if plaintiffs have identified specific nondiscretionary conduct, summary judgment in TVA's favor is still appropriate because plaintiffs have not come forward with evidence that the alleged nondiscretionary conduct caused the dike failure and ash spill.  TVA asserts that plaintiffs and their experts do not dispute the AECOM report's identification of the most probable root causes of the dike failure and there is "no real dispute" that the dike failure was due to subsurface foundational failure resulting from TVA's discretionary design and construction decisions.  TVA asserts that to the extent plaintiffs have focused on allegations of inadequate surface inspections and inspection protocols, substandard documentation, failure to follow policies and procedures, and failure

---

[16]"There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.  If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply.  Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Gaubert*, 499 U.S. at 325 n.7.

to train and conduct inspections and evaluations, plaintiffs have not explained and demonstrated that a causal relationship existed between this conduct and the dike failure. TVA also asserts that plaintiffs are asking the Court to infer that if TVA had simply performed better annual inspections or used better engineers, "the imminent catastrophic foundation failure somehow would have been revealed and TVA could have taken action to avoid the failure." [Doc. 202, p. 17]. While TVA has not challenged the admissibility of the testimony submitted by plaintiffs' experts, TVA asserts that the submitted affidavits and declarations are insufficient to defeat summary judgment because each consists of conclusory opinions and fails to describe the "physical mechanics" of how the alleged nondiscretionary conduct proximately caused the dike failure. Finally, TVA asserts that plaintiffs' allegations are speculative, unsupported by factual explanations or engineering computations, and are premised on the incorrect and unsupported assumption that the dike failure was initiated by a sidewall or slope failure.

In response, plaintiffs assert that causation is for the trier of fact to determine unless the undisputed facts and inferences make clear that reasonable persons will differ as to the proper outcome. Given the facts and the evidence in these cases, plaintiffs assert that such is not the situation in these cases the evidentiary record is replete with circumstantial evidence and expert testimony from which a trier of fact may infer that TVA's nondiscretionary acts and omissions were causes of the dike failure and ash spill. Plaintiffs also assert that the root causes of the dike failure are disputed and argue that they have identified other specific nondiscretionary conduct that contributed to the failure. According

to plaintiffs, not only are parts of the AECOM report's probable root cause findings disputed, but plaintiffs' experts and the various investigative reports show that TVA's neglect of the coal ash impoundment, failure to train TVA personnel to conduct routine maintenance inspections and monitor the impoundment, inadequate inspections, failure to conduct daily maintenance, failure to implement and follow policies and procedures, failure to follow approved design and construction drawings, and failure to implement technical recommendations and repairs, all caused and contributed to the dike failure [Doc. 192, p. 27 (citing Doc. 192-1, ¶¶ 6-54)]. Plaintiffs assert that the reports and evidence proffered by plaintiffs and their experts and gathered from testimony, memoranda, and e-mails by and between TVA employees, the EPA, and the TDEC, along with stability analyses, routine dike inspections, seepage reports, and evidence from consultants about repairs and modifications to the KIF plant, create genuine issues of material fact that preclude summary judgment. Finally, and in response to TVA's assertion that plaintiffs have not put forward evidence as to the "physical mechanics" of the dike failure, plaintiffs assert that such evidence is unnecessary because it falls within peoples' everyday experiences of the "ordinary perils of persistent neglect, and . . . squarely within the province of the trier of fact." [Doc. 192, pp. 26-27].

Under Tennessee law, in order to prevail on a claim of negligence, a plaintiff must establish: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation." *Staples*

*v. CBL & Ass., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). Causation in fact and proximate cause are distinct elements of a negligence claim and a plaintiff must prove both by a preponderance of the evidence. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendants' negligent conduct." *Kilpatrick*, 868 S.W.2d at 598. "Once it is established that the defendant's negligent conduct was, in point of fact, the actual cause of the plaintiff's injury or harm, the focus then becomes whether the policy of the law will extend responsibility for that negligent conduct to the consequences that have occurred." *Id.* Proximate cause is that act or omission which immediately causes or fails to prevent an injury; an act or omission occurring or concurring with another which, if it had not happened, the injury would not have been inflicted. *Tennessee Trailways, Inc. v. Ervin*, 438 S.W.2d 733, 735 (Tenn. 1969). Under Tennessee law:

> [T]here is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result . . . . Proximate cause . . . [is a] jury question[ ] unless the uncontroverted facts and inferences to be drawn from the facts make it so clear that all reasonable persons must agree on the proper outcome.

*McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 905 (Tenn. 1996) (citing *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994)).

The circumstances underlying the dike failure that is the subject of this litigation involve complex issues of causation. Questions of causation—whether factors apart from or in addition to the design and structure of the KIF plant and the surrounding impoundment

caused or contributed to the dike failure—are not easily determined. Further, while causation may at times be a classic issue for a fact-finder, the U.S. Supreme Court has stated that, on a request for summary judgment, "[w]here the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial[,]'" *Matsushita*, 475 U.S. at 587 (citation omitted), but the evidence must still be construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. *Id*. With this in mind, and after reviewing the voluminous submissions by both parties, the extensive record that is still being generated in these cases, and after considering the relevant law and what occurred on December 22, 2008 and in the preceding years, the Court concludes that genuine issues of material fact remain as to whether the nondiscretionary conduct alleged by plaintiffs caused or contributed to the dike failure and ash spill.

While the Court has before it TVA's assertions, supported by the findings of the AECOM report and, to some extent, the Marshall Miller Report and the OIG report, that the probable root causes of the dike failure are known, the Court cannot find, as a matter of law, that all such causes are either known or are undisputed at this time. In addition to the root cause findings of the AECOM report, the Court also has before it a finding from the Marshall Miller report that the scope of AECOM's work was limited, findings from the OIG report questioning TVA's management practices and noting that "red flags" and risks went unnoticed by TVA due to oversight and management problems, findings from the McKenna Long report that TVA's coal ash operations and procedures were characterized by a lack of

standardization and training, unclear responsibilities, and poor communication, and findings from the TDEC report describing inconsistent documentation and communication and noting a need for improved maintenance. Moreover, plaintiffs' affidavits, containing the opinions of environmental, civil, and geo-technical engineers, state positions consistent with various findings of these reports. For instance, the experts note a lack of standardization and training at the KIF plant, factors which they assert led to cursory inspections and inadequate annual and maintenance reports that made it impossible to monitor deterioration and safety issues. In addition, the experts state that the facilities at the KIF plant were inconsistent with approved design drawings and that neglect of the impoundment, its surface features and the containment dikes, was evident and contributed to dike instability. Accordingly, and after considering the evidence in the light most favorable to plaintiffs, the Court finds that sufficient evidence exists in the record of these cases to raise a factual question as to whether plaintiffs' allegations of certain nondiscretionary conduct by TVA caused the dike failure and ash spill.

Given the above, the Court is also not prepared to determine, at this time, what aspects of the causation inquiry will require expert testimony or engineering computations regarding the physical mechanics of how the alleged nondiscretionary conduct caused the dike failure. It appears to the Court that the design of the coal ash facilities and TVA's method of storing the ash were likely substantial causation factors in the failure of the dike and that these subjects will most likely require expert testimony regarding physical mechanics. Given the evidence submitted, however, the Court cannot conclude that other factors were not also

causes of the failure. While the Court agrees with TVA that expert testimony may be necessary to establish many aspects of causation, the Court agrees with plaintiffs that some of plaintiffs' allegations, such as allegations of poor management communication and training and neglect of the facilities, may not require this same level of expertise.

## H. Whether the Discretionary Function Doctrine Applies to a Private Nuisance Claim

The plaintiff in *Mays* has set forth a single private nuisance claim [*Mays*, Doc. 1, ¶¶ 44-48]. He asserts that because the elements of a private nuisance claim do not require an inquiry into the nature of a defendant's conduct but only an inquiry into the type of harm suffered by a plaintiff, his private nuisance claim is not susceptible to TVA's request for summary judgment based upon a lack of nondiscretionary conduct. In opposition, TVA asserts that under Tennessee law, the nature of a defendant's conduct is a key element of a private nuisance claim and the discretionary function doctrine, if applicable, precludes all tort claims, including those for nuisance.

Under Tennessee law, a private nuisance has been defined as "'anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable.'" *Sadler v. Tennessee*, 56 S.W.3d 508, 511 (Tenn. Ct. App. 2001) (quoting *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981)). A private nuisance is created when:

> [A] landowner uses his property in such a manner as to unreasonably interfere with [a] plaintiff's use or enjoyment of his own property . . . . The key element of any nuisance is the reasonableness of the defendant's conduct under the circumstances.

*Sadler*, 56 S.W.3d at 511(citations omitted); *Frank v. Gov't of City of Morristown*, 294 S.W.3d 566, 571 (Tenn. Ct. App. 2008) (noting that the plaintiff was disturbed in the use and enjoyment of her home but finding no compensable nuisance "[i]n the absence of any finding that [the defendant] acted unreasonably"). Given the foregoing, the requirement of Tennessee courts that a "key element" of a private nuisance claim is the "reasonableness" of a defendant's conduct, the Court disagrees with the *Mays* plaintiff that the consideration of a private nuisance claim does not require an inquiry into the nature of the defendant's conduct.

In addition, the Court notes that the *Mays* plaintiff has submitted no law indicating that the discretionary function doctrine does not apply to a private nuisance claim. The Court has reviewed a number of cases considering the discretionary function doctrine, including several cases in which courts have found the discretionary function doctrine applicable to nuisance claims. *See, e.g.*, *Harper v. Lockheed Martin Energy Sys., Inc.*, 73 F. Supp. 2d 917, 922 (E.D. Tenn. 1999) (holding that "all of the claims made by the plaintiff challenge conduct governed by discretion that is of the kind that the discretionary function exception was designed to shield," such claims including a claim for nuisance); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1538 n.8 (10th Cir. 1992) (holding the discretionary function doctrine applicable to nuisance and other alleged tort claims); *Tokio Marine Nichido Fire Ins. Co. v. United States*, No. 06-929-JE, 2009 WL 1011590, at *10 (D. Or. Apr. 15, 2009), *aff'd*, No. 09-35494, 2010 WL 2000996 (9th Cir. May 18, 2010) (noting that a nuisance claim would be bared by discretionary function immunity); *Gould Elecs., Inc. v. United States*, No. 99-

1130, 2002 WL 27834, at *4 n.2 (E.D. Pa. Jan 10, 2002) (finding that nuisance and tort claims were "not relevant in determining what actions or inactions by the government may be immune from suit under the discretionary function exception"); *Morris v. TVA*, 345 F. Supp. 321, 322 (N.D. Ala. 1972) (holding the discretionary function doctrine applicable to preclude a claim that "TVA's actions in operating [the] Wilson Dam constitute a nuisance"). Accordingly, in light of the above authority and the lack of authority on the inapplicability of the discretionary function doctrine to private nuisance claims, the Court agrees with TVA that the discretionary function doctrine, if applicable, does indeed preclude private nuisance claims.

Accordingly, given the foregoing, TVA's requests for summary judgment also apply to the nuisance claims in this litigation.

## IV. Conclusion

For the reasons set forth above, TVA's Nondiscretionary Conduct Motions [Doc. 176] are **DENIED in part** and **GRANTED in part**.

The motions are **GRANTED** to the extent that plaintiffs' allegations involve: TVA's discretionary conduct and decisions relating to the design and construction of the KIF plant; TVA's discretionary decision to keep in operation the KIF plant's wet coal ash disposal system; TVA's discretionary conduct and decisions relating to clean-up, removal, or remediation following the ash spill; TVA's discretionary conduct and decisions relating to policies and procedures for coal ash operations and management; and TVA's discretionary

decisions and conduct regarding modifications, repairs, and changes to the KIF plant and the surrounding impoundments.

The motions are **DENIED** to the extent that plaintiffs' allegations involve the following nondiscretionary conduct by TVA: negligent failure to inform or train TVA personnel in the applicable policies and procedures for coal ash operations and management; negligent or inadequate performance by TVA personnel of TVA's polices and procedures; negligence in the construction and implementation of approved design and construction plans; and negligent maintenance.

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE