UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

IN RE:

TENNESSEE VALLEY AUTHORITY
ASH SPILL LITIGATION

| ) | 3:09-CV-006 | 3:09-CV-555 | 3:09-CV-584 |
|---|---|---|---|
| ) | 3:09-CV-009 | 3:09-CV-563 | 3:09-CV-589 |
| ) | 3:09-CV-014 | 3:09-CV-564 | 3:09-CV-590 |
| ) | 3:09-CV-048 | 3:09-CV-565 | 3:09-CV-591 |
| ) | 3:09-CV-054 | 3:09-CV-566 | 3:09-CV-592 |
| ) | 3:09-CV-064 | 3:09-CV-568 | 3:09-CV-593 |
| ) | 3:09-CV-114 | 3:09-CV-569 | 3:09-CV-594 |
| ) | 3:09-CV-491 | 3:09-CV-570 | 3:09-CV-595 |
| ) | 3:09-CV-495 | 3:09-CV-571 | 3:09-CV-596 |
| ) | 3:09-CV-496 | 3:09-CV-572 | 3:09-CV-597 |
| ) | 3:09-CV-497 | 3:09-CV-576 | 3:09-CV-602 |
| ) | 3:09-CV-504 | 3:09-CV-577 | 3:09-CV-603 |
| ) | 3:09-CV-517 | 3:09-CV-578 | 3:09-CV-604 |
| ) | 3:09-CV-529 | 3:09-CV-579 | 3:09-CV-605 |
| ) | 3:09-CV-550 | 3:09-CV-580 | 3:10-CV-189 |
| ) | 3:09-CV-551 | 3:09-CV-581 | 3:10-CV-190 |
| ) | 3:09-CV-553 | 3:09-CV-582 | 3:10-CV-191 |
| ) | 3:09-CV-554 | 3:09-CV-583 | |
| ) | (VARLAN/GUYTON) | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This litigation consists of the more than fifty above-captioned cases filed against

defendant Tennessee Valley Authority ("TVA") following the December 22, 2008 failure of

a coal ash containment dike at TVA's Kingston Fossil plant in Roane County, Tennessee (the

"KIF plant"). Before the Court are TVA's Motions for Summary Judgment on Plaintiffs'

Tort and Inverse Condemnation Claims on Grounds of No Causation (the "No Causation

Motions") [Doc. 221].[1]

---

[1]Unless otherwise specified, all docket entry notations are numbered according to the docket entry sheet in *Chesney, et al. v. TVA, et al.*, Case No. 3:09-CV-09.

In the No Causation Motions [Doc. 221], TVA has moved for summary judgment on plaintiffs' tort and inverse condemnation claims on grounds of no causation. In opposition, plaintiffs have submitted five separate response briefs: the *Chesney* brief [*Chesney, et al. v. TVA*, Case No. 3:09-CV-09, Doc. 266]; the *Turner* brief [*Turner, et al. v. TVA*, Case No. 3:09-CV-495, Doc. 62]; the *Armes* brief [*Armes, et al. v. TVA*, Case No. 3:09-CV-491, Doc. 49]; the *Mays* brief [*Mays v. TVA*, Case No. 3:09-CV-06, Doc. 113]; and the *Daugherty* brief [*Daugherty, et al. v. TVA*, Case No. 3:10-CV-189, Doc. 34].[2] In the *Turner*, *Armes*, *Mays*, and *Daugherty* briefs, plaintiffs also state their intent to adopt and incorporate the response briefs filed by the other plaintiffs. TVA has filed a consolidated reply brief to plaintiffs' response briefs [Doc. 289]. TVA has also filed reply briefs addressing unique issues and arguments in several of the individual cases [*Turner*, Doc. 66; *Armes*, Doc. 50; *Mays*, Doc. 117; *Daugherty*, Doc. 35]. TVA also filed a supplemental brief [Doc. 338], to which plaintiffs filed responses [Doc. 340; *Turner*, Doc. 82; *Armes*, Doc. 57].

For the reasons set forth herein, TVA's No Causation Motions will be **GRANTED in part** and **DENIED in part**.

---

[2]Plaintiffs in *Rivers* filed a notice indicating their intent to adopt the *Mays* brief [*see Rivers*, Doc. 40] and plaintiffs in *Sandlin* and *Powers* filed notices indicating their intent to adopt the response briefs of the other plaintiffs in this litigation [*see Sandlin*, Doc. 40].

2

## I.     Relevant Factual and Procedural Background[3]

Following the dike failure and coal ash spill at the KIF plant on December 22, 2008, plaintiffs filed the above-captioned cases against TVA.[4] In the complaints, plaintiffs allege that they reside, own property, and/or own businesses within the vicinity of the ash spill. While not identical, the complaints assert similar allegations and tort law causes of action—*e.g.*, negligence, negligence per se, gross negligence, trespass, nuisance, and strict liability. Several plaintiffs request that TVA be ordered to fund medical monitoring and several plaintiffs allege claims for inverse condemnation. Plaintiffs are seeking compensatory damages and/or injunctive relief. Four of the above-captioned cases are set for trial in September 2011.[5] The remainder of the above-captioned cases are set for trial in November 2011.

In April 2009, TVA filed motions to dismiss or for summary judgment on grounds that the federal discretionary function doctrine applies to TVA and requires dismissal or summary judgment in TVA's favor on all plaintiffs' tort claims ("the Discretionary Function

---

[3]For background on the KIF plant and the December 22, 2008 dike failure and coal ash spill, please *see Mays v. TVA*, 699 F. Supp. 2d 991 (E.D. Tenn. 2010).

[4]Plaintiffs in *Chesney* also alleged claims against WorleyParsons Corporation and Geosyntec Consultants, Inc., professional engineering contractors who provided engineering consultant services and/or advice to TVA at various times from 2004 through 2007. These defendants filed a separate motion to dismiss or motion for summary judgment [Doc. 203], which the Court granted on March 22, 2011, thereby dismissing these defendants from this litigation [Doc. 318].

[5]At present, the cases set for trial in September 2011 are *Mays v. TVA*, Case No. 3:09-CV-06; *Chesney, et al. v. TVA*, Case No. 3:09-CV-09; *Auchard, et al. v. TVA*, Case No. 3:09-CV-54; *Raymond, et al. v. TVA*, Case No. 3:09-CV-48; and *Scofield, et al. v. TVA*, Case No. 3:09-CV-64. The remainder of the cases are set for trial in November 2011.

Motions") [*see* Doc. 46].  On March 26, 2010, the Court ruled on these motions, finding that the discretionary function doctrine applies to TVA and protects TVA's conduct that was grounded in considerations of public policy and involved the permissible exercise of policy judgment.  *See Mays v. TVA*, 699 F. Supp. 2d 991, 1016, 1019 (E.D. Tenn. 2010).  On July 16, 2010, TVA filed motions for summary judgment on plaintiffs' tort claims on the nondiscretionary conduct issue (the "Nondiscretionary Conduct Motions").  On September 17, 2010, TVA filed the No Causation Motions [Doc. 221].  On March 24, 2011, the Court denied in part and granted in part the relief sought by TVA in the Nondiscretionary Conduct Motions [Doc. 319].  *See In re TVA Ash Spill Litig.*, — F. Supp. 2d —, 2011 WL 1113425 (E. D. Tenn. Mar. 24, 2011).

The Court now turns to the No Causation Motions.  In these motions, TVA asserts that plaintiffs have failed to demonstrate that actionable, nondiscretionary conduct by TVA caused plaintiffs' alleged injuries and damages.  TVA argues that plaintiffs have failed to demonstrate causation with respect to their personal injury and emotional distress claims, their property-related claims of trespass and nuisance and their inverse condemnation claims. In response, plaintiffs assert that they have demonstrated causation and that genuine issues of material fact exist as to each claim.  Plaintiffs also assert that summary judgment is inappropriate at this time and request that the Court deny TVA's motions pursuant to Federal Rule of Civil Procedure 56(f) to allow plaintiffs sufficient time to conduct more discovery.

4

## II.    Standard of Review

A court may grant summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). The Court views the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The genuine issue must also be material.  That is, the issue must involve facts that might affect the outcome of the suit under the governing law.  *Liberty Lobby*, 477 U.S. at 248.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact.  *Id.* at 250.  The Court does not weigh the evidence or determine the truth of the matter.  *Id.* at 249.  Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250.

## III.   Analysis

### A.   Request to Deny Summary Judgment Pursuant to Rule 56(f)

Plaintiffs have requested that the Court deny the No Causation Motions to provide plaintiffs sufficient time to conduct more discovery to respond to TVA's motions. Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, plaintiffs in *Chesney* assert that more time is needed for discovery and to gather additional evidence to dispute and confirm various facts relevant to TVA's motions and plaintiffs' arguments [*see* Doc. 267]. Plaintiffs assert that additional evidence will show that coal ash is present on plaintiffs' properties, that the coal ash spill caused plaintiffs to suffer a nuisance, and that toxic constituents from coal ash are present throughout the Watts Bar Reservoir (the "Reservoir"), the surrounding waterways, the shoreline strip, and in the air. TVA opposes plaintiffs' requests.

When a summary judgment motion is filed, the party opposing the motion may, by affidavit under Rule 56(f), explain why he or she is unable to present facts essential to justify the party's opposition to the motion. *See* Fed. R. Civ. Pro. 56(f); *Wallin v. Norman*, 317 F.3d 558, 564 (6th Cir. 2003). "The burden is on the party seeking additional discovery to demonstrate why such discovery is necessary." *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004). Bare allegations or vague assertions of the need for additional time for discovery are not enough. *United States v. Cantrell*, 92 F. Supp. 2d 704, 717 (S.D. Ohio 2000) (citing *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 409 (6th Cir. 1998)). The U.S. Court of

6

Appeals for the Sixth Circuit has found that a party must make such a request with "'some precision" and must state "the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment.'" *Summers*, 368 F.3d at 887 (quoting *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)).

The dike failure and ash spill occurred on December 22, 2008. It is now more than two years since the spill and the filing of the first cases in this litigation. At the time TVA filed the No Causation Motions, and throughout the briefing of these motions, neither the clean-up from the spill nor discovery in these cases was complete, but both have been ongoing since the filing of the first case. In addition, all discovery has been made available to all parties. Plaintiffs have also requested and been granted a number of extensions to file responses to motions and to extend various deadlines. Furthermore, nothing has prevented the parties from filing supplemental briefs regarding the matters raised in TVA's motions.

Plaintiffs' counsel filed an affidavit stating that more time for discovery might reveal more information that would be pertinent to the No Causation Motions. Specifically, the affidavit provides that plaintiffs "have sufficient evidence to soundly refute TVA's motions . . . [but] there may be additional evidence that could support their response." [Doc. 267, pp. 1-2]. The Court does not find this affidavit to make a sufficient showing warranting the relief requested in Rule 56(f). *See Cacevic v. City of Hazel Park*, 226 F.3d 483, 489 (6th Cir. 2000) ("Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need

7

for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information."). Moreover, as indicated above, plaintiffs are in control of their properties and have been since December 22, 2008. In the absence of specific facts showing otherwise, the Court finds that plaintiffs have had adequate time to conduct investigations for purposes of their claims.

Accordingly, plaintiffs' request that the No Causation Motions be denied pursuant to Rule 56(f) is **DENIED**.

## B.    Plaintiffs' Tort Claims

The Tennessee Supreme Court requires a plaintiff to establish five elements in a tort claim for common law negligence: (1) a duty of care owned by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal cause. *Staples v. CBL & Ass., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *see also Beaty Chevrolet Co. v. Norfolk S. Railway Co.*, No. 3:03CV442, 2005 WL 1182444, at *3 (E.D. Tenn. May 18, 2005).

### 1.    Tennessee's Recreational Use Statute

TVA argues that under the Tennessee recreational use statute, T.C.A. §§ 70-7-101, *et seq.*, TVA has no legal duty to keep the TVA-created and controlled Reservoir and shoreline strip safe for plaintiffs' recreational use and enjoyment. TVA argues that because plaintiffs have no property interest in the waters of the Reservoir or the adjacent shoreline strip, their tort claims cannot be premised on the theory that TVA owed plaintiffs a legal duty to keep these areas safe, or perceived safe, for plaintiffs' recreational use and enjoyment. In

8

particular, TVA notes that plaintiffs' nuisance claims are premised on the theory that ash

particles in the Reservoir and on the shoreline strip have rendered plaintiffs' recreational use

of these areas less desirable and diminished plaintiffs' use and enjoyment of their properties.

Plaintiffs disagree and argue that the Tennessee recreational use statute has nothing to do

with their claims beyond conferring a standard of care, or lack thereof, on TVA.

The Tennessee recreational use statute provides that:

> The landowner, lessee, occupant, or any person in control of land or premises owes no duty of care to keep such land or premises safe for entry or use by others for such recreational activities as hunting, fishing, . . . camping, water sports, . . . canoeing, hiking, sightseeing, . . . bird watching, . . . boating, . . . [and] nature and historical studies . . . , nor shall such landowner be required to give any warning of hazardous conditions, uses of, structures, or activities on such land or premises to any person entering on such land or premises for such purposes, except as provided in § 70-7-104.

T.C.A. § 70-7-102.[6] The Tennessee Supreme Court has described this statute as "provid[ing]

the State with limited immunity for injuries occurring on state-owned property during

recreational use[,]" subject to certain limitations and exceptions. *Parent v. State*, 991 S.W.2d

240, 242 (Tenn. 1999). Whether the state or a governmental entity is entitled to immunity

under the Tennessee recreational statute requires a two-pronged analysis: (1) whether the

activity alleged is a recreational activity as defined by the statute; and if so, (2) whether any

of the statutory exceptions or limitations to the immunity defense are applicable. *Id.* at 243.

---

[6]The statute applies to "land" or "premises," terms defined to included "real property [and] waters . . . owned by any governmental entity, including, but not limited to, the Tennessee Valley Authority." T.C.A. § 70-7-101(1)(B).

In this litigation, plaintiffs are not bringing claims for injury or damage that occurred during a recreational activity on or in the Reservoir or on the shoreline strip. Rather, plaintiffs' claims involve allegations pertaining to the impact of ash from the coal ash spill on their persons, properties, and their use and enjoyment of those properties.[7] Given these claims, the Court agrees with plaintiffs that the recreational use statute does not operate as a complete bar to their claims by rendering TVA immune from liability. While TVA may be entitled to immunity under the recreational use statute in regard to a claim premised upon an alleged injury or damage occurring during a "recreational activity" on or upon entry to TVA's property, plaintiffs' claims in this litigation do not appear to involve this type of claim. *See, e.g., Mathews v. State*, No. W2005-010420COA0R3-CV, 2005 WL 3479318, at *2 (Tenn. Ct. App. Dec. 19, 2005) (finding that the Tennessee recreational use statute applied to a plaintiff's claim to recover for injuries she sustained when she slipped and fell on a sidewalk irregularity as she entered a state park for a hike and hay ride and noting that "the language used in the statute indicates that it applied the moment a visitor enters the property for a recreational purpose, even if the visitor has not yet begun the recreational activity[.]").

---

[7]Plaintiffs' allegations include "extreme inconvenience and annoyance" involving road and waterway closures; the closing of the Emory River and recreational advisory warnings advising the public against swimming, jet skiing, water skiing, and tubing in the Emory and Clinch Rivers ; bright lights; noise; heavy equipment blocking access to their homes; foul smells; decreased property values; and views from their properties of dead fish in the Reservoir and of a layer of scum on top of the water [Doc. 266, pp. 11-14].

10

## 2.	Actionable Conduct

The Court agrees with TVA that a plaintiff must show that actionable conduct by TVA caused the claimed damage or injury [Doc. 289, p. 18]. In this litigation, for TVA's conduct to be actionable, plaintiffs are required to show that the conduct was nondiscretionary. In the Court's order on the Discretionary Function Motions, the Court found that TVA's conduct that was grounded in considerations of public policy and involved the permissible exercise of policy judgment—conduct such as TVA's design decisions for the KIF plant and TVA's post-ash spill removal and remediation conduct—was protected by the discretionary function doctrine and not actionable conduct for purposes of plaintiffs' tort claims. *See Mays*, 699 F. Supp. 2d at 1016-19, 1033. TVA's nondiscretionary conduct, or conduct not grounded in policy decisions, was found to lie outside the discretionary function doctrine and is therefore potentially actionable. *Id.* at 1021-22.

In the Court's order on the Nondiscretionary Conduct Motions, the Court narrowed the conduct for which TVA may be held liable and held that the following conduct was not actionable because it fell within the discretionary function doctrine:

> TVA's discretionary conduct and decisions relating to the design and construction of the KIF plant; TVA's discretionary decision to keep in operation the KIF plant's wet coal ash disposal system; TVA's discretionary conduct and decisions relating to clean-up, removal, or remediation following the ash spill; TVA's discretionary conduct and decisions relating to policies and procedures for coal ash operations and management; and TVA's discretionary decisions and conduct regarding modifications, repairs, and changes to the KIF plant and the surrounding impoundments.

11

*In re TVA Ash Spill Litig.*, 2011 WL 1113425, at *18. The Court found that the following

conduct was potentially actionable because it involved allegations of nondiscretionary

conduct:

> [N]egligent failure to inform or train TVA personnel in the applicable policies and procedures for coal ash operations and management; negligent or inadequate performance by TVA personnel of TVA's polices and procedures; negligence in the construction and implementation of approved design and construction plans; and negligent maintenance.

*Id.* The Court also found that the discretionary function doctrine applies to plaintiffs' claims

for nuisance. *Id.*

### 3. Causation

The Court now turns to the issue of causation, the primary focus of the No Causation

Motions. Causation is a two-part inquiry, cause in fact and proximate, and courts often

subsume the two inquiries into one. Cause in fact means that the injury or harm would not

have occurred "but for" the defendant's negligent conduct. *Kilpatrick v. Bryant*, 868 S.W.2d

594, 598 (Tenn. 1993). A more complicated inquiry is involved in determining proximate

cause, an issue which Tennessee's highest court has recognized as the "ultimate issue" in

negligence cases. *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991) (noting that

"[o]ur opinions have recognized that proximate causation is the 'ultimate issue' in negligence

cases."). To determine proximate cause, Tennessee courts follow a three-pronged test: "(1)

the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm

being complained of; and (2) there is no rule or policy that should relieve the wrongdoer

12

from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person or ordinary intelligence and prudence." *Id.* (citing cases). This test, and the analysis of courts considering issues of proximate cause under Tennessee law, indicates that this test is inextricably linked to the facts and circumstances of the specific case, the type of claim alleged, and the type of harm or injury claimed. Moreover, as the cases show, "[t]he question of proximate causation is always to be determined on the facts of each case." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1999 (6th Cir. 1988).

TVA argues that plaintiffs have failed to show that the coal ash spill caused ash particles to be transmitted to plaintiffs' properties in material quantities or concentrations "sufficient to cause property damage and/or personal injury or to constitute a taking[.]" [Doc. 222, p. 15]. Assuming the ash or its constituents to be harmful, TVA asserts that plaintiffs must prove that the spill caused "material quantities or concentrations of coal ash to be transmitted to *each* of the Plaintiffs' properties" [*Id.* (emphasis in original)], through a potential pathway of transmission such as the initial flow of ash sludge, transmission through water in the Reservoir, the surrounding waterways, or drinking water, or transmission through ambient air [*Id.*]. TVA asserts that plaintiffs have not produced evidence of an issue of fact as to whether plaintiffs were exposed to the metals in the ash through a transmission pathway in a quantity or concentration sufficient to cause physical injury or emotional distress or whether the ash reached plaintiffs' properties for purposes of their property-related claims of trespass and nuisance or their inverse condemnation claims

13

[*Id.*, p. 16].  TVA also asserts that plaintiffs have failed to establish an issue of fact that ash concentrations on plaintiffs' properties have increased above historical background levels since the December 22, 2008 spill or were not a result of TVA's discretionary conduct.

Plaintiffs disagree and assert that they have produced evidence that gives rise to issues of fact as to whether ash constituents released during the spill entered and remain in the air and water, whether ash particles came onto and remain on their properties and in the waters of the Reservoir and surrounding waterways, and whether the ash particles contain potentially harmful levels of toxic constituents.  Plaintiffs also assert that they have produced evidence of a genuine issue of fact as to whether these particles invaded their properties, caused them injury, and interfered with their use and enjoyment of their properties.  Plaintiffs argue that TVA has erroneously conflated the standards of causation for different types of tort claims into a single, strict personal injury standard of causation.  They assert that under Tennessee law, trespass and nuisance claims do not require the same causation standard as claims of personal injury and emotional distress.  Plaintiffs also argue that they have put forth sufficient evidence to establish genuine issues of fact as to whether TVA's discretionary conduct leading to the ash spill caused ash particles to enter their properties above historical background levels.

While the Court has noted TVA's assertion that the causation principles premised upon claims of personal injury and emotional distress due to exposure to toxic constituents are applicable regardless of whether the alleged tort is an injury to person or to property [Doc. 222, pp. 14, 21-22; Doc. 338, p. 3], TVA has cited no case under Tennessee law in

14

support of this proposition.   Accordingly, after due consideration of the cases under Tennessee law considering claims of personal injury, emotional distress, trespass, and nuisance, the Court finds, as discussed below, that these claims involve related but distinct inquiries into causation and that each type of claim should be considered separately.

### C.    Plaintiffs' Personal Injury and Emotional Distress Claims[8]

Under Tennessee law, in order to establish proximate cause for claims of intentional or negligent infliction of emotional distress or bodily injury due to environmental exposure to toxic chemicals or to diseases such as AIDS, "evidence of a medically recognized channel of transmission" is required.  *Bain v. Wells*, 936 S.W.2d 618, 624-25 (Tenn. 1997) ("[I]t is well-established that to recover on a claim of negligence, a plaintiff must show *some* reasonable connection between the act of omission of a defendant and the injury which the plaintiff has suffered.").  A plaintiff alleging a fear of injury or injuries resulting from toxic chemicals or AIDS must also show "actual—not potential—exposure."  *Id.*; *Sterling*, 855

---

[8]At a status conference held on July 19, 2011, the Court inquired of counsel for the parties which plaintiffs were asserting personal injury and emotional distress claims.  Counsel for plaintiffs in two of the cases set for trial in September 2011 and one of the cases set for trial in November 2011 confirmed that plaintiffs in the cases set for trial in September 2011 were no longer pursuing claims for personal injury and emotional distress.  Counsel for plaintiffs in the cases set for trial in November 2011 confirmed that nine of the plaintiffs in six cases continued to pursue claims for personal injury and emotional distress, but the plaintiffs in the other cases either had never asserted such claims or were no longer pursuing such claims.

At the time of briefing, plaintiffs in several of the cases set for trial in September 2011 were pursuing personal injury and emotional distress claims and provided argument and evidence in support of those claims.  Because plaintiffs who continue to assert personal injury and emotional distress claims have expressly adopted and incorporated the briefs and arguments filed by other plaintiffs, the Court has considered all of the submitted briefs and evidence regarding plaintiffs' personal injury and emotional distress claims.

15

F.2d at 1999 (affirming the trial court's finding that the plaintiffs' "presently ascertainable and reasonably anticipated future injuries were proximately caused by ingesting or otherwise using contaminated water").  In once such case, *Sterling v. Velsicol Chem. Corp.*, in which the U.S. Court of Appeals for the Sixth Circuit applied Tennessee law to tort claims for injuries due to exposure to contaminated water, the Sixth Circuit emphasized that it is:

> [T]he responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by ingestion or otherwise using the contaminated water.  We cannot emphasize this point strongly enough because generalized proofs will not suffice to prove individual damages.

855 F.2d at 1200.  *See also Bain*, 936 S.W.2d at 624-26 (finding that the plaintiff had failed to show proximate cause because he had not provided proof of actual exposure to AIDS and had not shown a medically valid channel of transmission).

Similarly, in *Robinson v. Union Carbide Corp.*, the plaintiff alleged that the illnesses of his parents and the death of his father were a result of mercury intoxication brought about by the conduct of the defendant, a nuclear weapons plant.  805 F. Supp. 514, 515 (E.D. Tenn. 1991).  The plaintiff alleged that the defendant caused the discharge of large quantities of mercury into nearby waterways surrounding his parents' home.  *Id.*  He asserted that the mercury got into the water where his parents fished, that it contaminated the fish they caught and ate, and that, by eating the contaminated fish, his parents ingested unsafe amounts of mercury which resulted in mercury intoxication.  *Id.*  The defendant moved for summary judgment, arguing that the plaintiff had failed to present sufficient evidence that his parents' illnesses and the death of his father was caused by mercury intoxication for which the

16

defendant was responsible. *Id.* The district court agreed, finding that the evidence fell short of the evidence necessary for a showing of chronic ingestion of contaminated fish resulting in mercury intoxication. *Id.* at 524.

> It is apparent that proof of causation in fact in this case requires at a minimum evidence that mercury from [the defendant's facilities] found its way, in dangerous levels, into fish in the areas where [the plaintiff's parents] fished, either because fish already contaminated migrated into these areas, or because the mercury itself came into the waterways and entered into the food chain including the fish caught and eaten by [the parents].

*Id.* at 524.

TVA does not dispute that metals and chemicals bound up in coal or fly ash *could* be toxic to humans depending on the level of exposure. Referencing the causation analyses in *Bain*, *Sterling*, and *Robinson*, TVA asserts, however, that mere exposure to ash particles does not equate to purported exposure and ingestion of the potentially toxic constituents within those particles. TVA submits that toxicological and scientific data regarding coal and fly ash shows that while constituents in ash particles may be toxic at certain levels, because the constituents are bound within ash particles that are stable under most conditions, plaintiffs' allegations of mere exposure to ash is insufficient evidence of causation that their exposure resulted in a particular injury or stress [*see* Doc. 268-4, pp. 130-53; Doc. 22-3]. TVA also asserts that no plaintiff claiming personal injury or emotional distress has shown that he or she was actually exposed to the potentially toxic constituents bound up in the ash through a valid transmission pathway, such as ingestion, and not merely exposed to the ash itself, and that plaintiffs have not provided evidence that any plaintiff ingested or otherwise used the

17

ash in a manner and to a level that could cause personal injury or emotional distress [Doc. 289, p. 6]. In further support of its position, TVA points to the findings of the Public Health Assessment (the "PHA"), prepared by the Tennessee Department of Health and issued on September 7, 2010, which found that "the coal ash at the site of the KIF coal ash release should not have caused harm to the community's health" [PHA, Doc. 222-2, pp. 3-141]. Last, TVA points to the negative results of medical screenings for the presence of heavy or toxic chemicals in individuals from households in the area of the ash spill [Doc. 280-2, pp. 1-31].

Plaintiffs argue that they have provided evidence of an issue of fact because they have shown that coal and fly ash contain a variety of potentially toxic constituents [Doc. 266, pp. 9-10; Decl. Nicholas Cheremisinoff, Ph.D ("Cheremisinoff"), Doc. 268-4, ¶ 22; Decl. Stephen King, Ph.D, M.P.H. ("King"), Doc. 268-5, ¶¶ 12-13]. They assert that environmental scientists and toxicologists have concluded that it is *likely* that constituents in coal or fly ash would *likely* cause bodily injuries or other irritants and that health concerns arising from exposure to ash are reasonable and well-founded [Decl. King, Doc. 268-5, ¶ 14 ("I conclude that if residents living in proximity to the TVA coal ash spill zone could observe ash on their properties, they likely experienced exposures to coal ash particulates that were sufficient to cause the development of respiratory symptoms and medical conditions[.]"); *Davis, et al. v. TVA*, Case No. 3:09-CV-577 ("*Davis*"), Aff. Marty G. Wallace, M.D. ("Wallace"), Doc. 51-3, ¶¶ 7-10]. Plaintiffs have also submitted evidence of a litany of aliments that may result from exposure to constituents present in coal and fly ash [Decl.

18

Cheremisinoff, Doc. 268-4, ¶¶ 21-22; Decl. Barry W. Sulkin ("Sulkin"), Doc. 268-9, ¶¶16-19; Doc. 266, p. 6-8; Decl. King, Doc. 268-5, ¶ 14]. Plaintiffs point to evidence that individuals living in the area were told by doctors to immediately leave the area after the spill, that individuals residing in the area reported a worsening of respiratory and other symptoms and increased stress and anxiety within weeks of the spill, and the testimony of individual plaintiffs stating that they were exposed to coal ash in the environment and on their properties and that after such exposure, they experienced respiratory symptoms and stress.[9] Plaintiffs also assert that the PHA and the negative screening results referenced by TVA are not the final word on the health risks arising out of the spill, that the investigations into such risks are ongoing, and that the studies and reports referenced by TVA do not contemplate the presence of arsenic constituents in the ash and the effect on the public.

Viewing this evidence in the light most favorable to plaintiffs, the Court concludes that plaintiffs have not established a genuine issue of fact that their exposure to the coal or fly ash in the environment equates to an exposure to the potentially toxic constituents bound up in the ash. Plaintiffs have not put forth evidence of a causation link between exposure to the ash and a specific personal injury, respiratory symptom, or emotional distress. Although plaintiffs argue that exposure to the toxic constituents in the ash exists by virtue of the

---

[9]*See, e.g.*, *Daugherty, et al. v. TVA*, Case No. 3:09-CV-576 ("*Daugherty*"), Affs. Evelyn & Glenn Daugherty, Docs. 55-4, 55-5 ("I and members of my family were and have been exposed to coal ash on the Property . . . as a result of the Ash Spill[.]"); *Davis*, Aff. Kristine Davis, Doc. 51-4 ("Since the date of the Ash Spill, my physical health has deteriorated. I have experienced a number of physical symptoms previously unknown to me and have acquired conditions that I believe are attributable to the Ash Spill, including but not limited to (i) itchy eyes; (ii) runny nose; (iii) skin rashes; and (iv) exacerbation of anxiety and depression.").

19

presence of ash in the environment, the mere existence of a toxin in the environment is insufficient to establish causation without proof that the individual was actually exposed to the toxin and at a level sufficient to cause injury or stress. Similar to the plaintiffs in *Sterling* and *Robinson*, plaintiffs have not shown actual exposure to the potentially *toxic constituents* in the ash or brought forth evidence that a plaintiff ingested or used the ash at the requisite level to have resulted in a personal injury or emotional distress. Moreover, plaintiffs have not set forth a minimum level of exposure for personal injury or emotional distress, let alone that a certain plaintiff ingested or used enough of the ash to make a claim viable. Furthermore, plaintiffs have not provided toxicological evidence or health reports and screenings that refute the evidence and reports submitted by TVA. Rather, plaintiffs have only provided evidence that the constituents in coal and fly ash may, at certain levels, cause injury and stress. Accordingly, given what Tennessee law requires for a showing of causation for personal injury and emotional distress claims arising out of exposure to toxic constituents in the environment, plaintiffs' lack of evidence showing actual exposure to the potentially toxic constituents (and not just exposure to the ash itself) in a level sufficient to cause personal injury or emotional distress, and the lack of evidence showing actual ingestion or use, TVA's requests for summary judgment as to those plaintiffs asserting personal injury and emotional distress claims are hereby **GRANTED**.

### D. Plaintiffs' Property-Related Claims of Trespass and Nuisance

The Court now turns to plaintiffs' trespass and nuisance claims. Upon the Court's repeated scrutiny of the briefs, it does not appear that any party has discussed a case applying

20

Tennessee law that clearly articulates a causation analysis for trespass and nuisance claims premised upon the entry onto property of small or potentially intangible ash particles or particulate matter ("PM") from coal or fly ash. TVA argues that an analysis similar to that which applies to plaintiffs' personal injury and emotional distress claims applies to plaintiffs' claims of trespass and nuisance as well. Plaintiffs argue that their trespass and nuisance claims involve distinct elements and different standards of causation which must be considered separately. Upon the Court's review of the cases that have considered trespass and nuisance claims under Tennessee law, the Court agrees with plaintiffs that claims for trespass and nuisance involve different inquiries than plaintiffs' personal injury and emotional distress claims.

### 1.    Plaintiffs' Trespass Claims

TVA argues that Tennessee follow the "modern view" of trespass which recognizes that the imposition of liability premised upon a trespass onto property of ubiquitous particles is limited to cases were actual and substantial harm is alleged and shown. Plaintiffs disagree, arguing that under Tennessee law, a trespass is defined as the unauthorized entry upon the real property of another and has no requirement that a certain amount of level of harm be shown. Plaintiffs assert that a trespass claim may be premised upon the entry onto property of intangible particles such as dust, gas, or odors, regardless of the degree of force used or the resulting level or amount of damage.

In describing a trespass claim under Tennessee law, both parties refer to *Stephens v. Koch Foods, LLC*, and that court's adoption of "the 'modern' view of trespass." 667 F.

Supp. 2d 768, 795-96 (E.D. Tenn. 2009). In *Stephens*, the plaintiffs alleged federal and state law claims against the defendant, including a claim for trespass. *Id.* at 771. The plaintiffs alleged that sewer lines installed and operated by the defendant out of a poultry deboning plant emitted odorous gases and mists which entered the plaintiffs' properties without their permission. *Id.* at 794. One plaintiff also alleged that wastewater had entered her home through her sewer pipes. *Id.* The defendant, citing a single case from the Tennessee court of appeals, moved for summary judgment on the plaintiffs' claims for trespass premised upon the entry onto their properties of intangible gas and mist particles. *Id.* at 795. Summary judgment was proper, the defendant argued, because Tennessee law of trespass requires a direct entry onto land by a tangible object. *Id.* The plaintiffs disagreed, arguing that Tennessee follows the modern trend in trespass law, which, they asserted, allows "an action based on intangible entries." *Id.*

After citing several cases interpreting the law of trespass from other states, the *Stephens* court distinguished the Tennessee case cited by the defendant and declined to follow the defendant's position that Tennessee trespass law did not permit a claim for trespass premised on the entry of intangible particles. *Id.* at 795-96. The *Stephens* court then held that it would follow the "modern" view of trespass, the position advanced by the plaintiffs. *Id.* The *Stephens* court did not, however, articulate the requirements for causation in the context of a trespass claim, nor did it mention limiting the imposition of liability for a trespass claim premised upon intangible particles to situations where actual and substantial harm is shown. The *Stephens* court ultimately concluded that an issue of fact existed and

22

denied the defendant's request for summary judgment on the plaintiffs' trespass claims. *Id.* at 796.

Upon review of the cases cited in *Stephens* as exemplars of the "modern" trend of trespass law, *id.* at 795 (citing cases), the Court finds that a common element in each of those cases is that a trespass claim may be premised upon the entry onto property of intangible particles. While several of the cases state the requirement that the harm alleged for a trespass must be alleged and shown to be "actual and substantial," several of the cases do not contain this requirement. *See Mercer v. Rockwell Intern. Corp.*, 24 F. Supp. 2d 735, 743 (W.D. Ky. 1998) (holding that under Kentucky law, an essential element of a trespass claim was that PCB's interfered with the plaintiffs' right to exclusive possession by causing "actual harm" to the property); *Williams v. Oeder*, 659 N.E.2d 379 (Ohio App. 1995) (approving the trial court's finding that for a trespass claim under Ohio law, substantial damage to the property is a required element when the trespass claim is for entry to property by airborne pollutants). *But see Stevenson v. E.I. DuPont De Nemours & Co.*, 327 F.3d 400, 405-06 (5th Cir. 2003) (finding no Texas case clearly adopting the substantial damage requirement beyond situations where state law had already set a minimum level of damage and holding that because "the only showing necessary is entry over land by some 'thing,' Texas law would permit recovery for airborne particles"); *Ream v. Keen*, 828 P.2d 1038, 1040 (Or. App. 1992) (holding that actual damage is not necessary for a defendant to be liable for intentional trespass of smoke over the plaintiff's property); *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 794 (Or. 1959) (stating that "we may define trespass as any intrusion which invades the possessor's

23

protected interest in exclusive possession, whether that intrusion is by visible or invisible pieces of matter or by energy which can be measured only by the mathematical language of the physicist"). Other cases considering a claim for trespass under Tennessee law support plaintiffs' position that there is no requirement that actual and substantial harm be shown. *See, e.g. Burlison v. United States*, No. 2:07-cv-02151-JPM-cgc, 2011 WL 1002808, at *8 (W. D. Tenn. Mar. 15, 2011) ("Under Tennessee law, "[e]very unauthorized entry upon another's realty is a trespass, regardless of the degree of force used or the amount of damage.") (quoting *Baker v. Moreland*, No. 89-62-II, 1989 WL 89758, at *4-*5 (Tenn. Ct. App. Aug. 9, 1989) (noting that "[e]very unauthorized entry upon another's realty is a trespass, regardless of the degree of force used or the amount of damage.")). Tennessee courts considering trespass claims have also noted that in addition to the potential for the recovery of compensatory and consequential damages, nominal damages are always available. *See Burlison*, 2011 WL 1002808, at *8; *Jackson v. Bownas*, No. E2004-01893-COA-R3-CV, 2005 WL 1457752, at *8 (Tenn. Ct. App. June 21, 2005); *Baker*, 1989 WL 89758, at *4-*5 ("Even if no damage is done or the injury is slight, the trespass gives rise to a cause of action for nominal damages at least."); *Price v. Osborne*, 147 S.W.2d 412, 413 (Tenn. Ct. App. 1940).

Given the above, the Court agrees with plaintiffs that a trespass claim under Tennessee law may be premised upon the entry onto property of intangible particles and that there is no requirement of actual and substantial harm. This does not, however, obviate the requirement that plaintiffs must show causation, that particles from the ash spill, either

tangible or intangible, entered plaintiffs' properties and would not have done so "but for" actionable conduct by TVA.

TVA argues that plaintiffs have not put forward evidence that particles from the ash spill were transmitted to plaintiffs' properties as a result of actionable conduct by TVA and that these particles entered or remain on their properties. Referencing data from reports on the KIF plant's release of particles and chemical compounds into ambient air, and data from air monitors showing the average amounts of airborne PM within the area of the spill from years preceding and following the ash spill, TVA asserts that the average amount of particles and chemical compounds in the air since the spill was lower than in the years preceding it and national air quality standards for emissions of PM were met the year following the spill. TVA also assert that, according to the PHA, there is no known public health threat from the airborne PM that might have been released as a result of the spill. TVA also argues that plaintiffs have not shown that water containing ash particles came onto their properties or got into their drinking water. TVA points to the finding in the PHA that water monitoring data shows very little leaching of metals and metalloids from ash particles in the Reservoir or surrounding waterways. Finally, pointing to evidence including pictures and satellite maps, TVA argues that the initial flow of coal ash sludge never came onto plaintiffs' properties and never deposited ash particles onto their properties [*see* Doc. 222-1, p. 10-30; Decl. Cassandra L. Wylie ("Wylie"), Doc. 222-1, pp. 63-80; Doc. 222-3, pp. 130-40; Doc. 222, pp. 6, 11-15-135].

Plaintiffs argue that TVA's data on the decreased presence of chemical compounds in the air and of airborne PM within the area of the spill is explained by other variables, including evidence that the KIF plant and another nearby plant ran at reduced capacities the year after the spill, burning less coal and releasing fewer emissions [Decl. Cheremisinoff, Doc. 268-4, ¶¶ 12-15]. Plaintiffs assert that with these plants running at reduced capacities, the lower concentrations noted by TVA would have been lower but for the emissions released as a result of the ash spill [*Id.*]. An expert retained by plaintiffs has stated that following the ash spill, PM was collected at various monitoring sites and that this data and other data provided by the Environmental Protection Association (the "EPA") show that following the spill, areas around the KIF plant and the site of the spill had elevated PM levels [*Id.*, ¶¶ 15-22]. Plaintiffs also submit that the evidence gathered by their experts shows that these particles came from fugitive releases at ground level which implies that the particles came from the ash spill and not taller emission stacks which would emit particles at a greater height. Plaintiffs also point to several affidavits given by plaintiffs which state that on the day of the spill and several days after it, they observed wind-blown ash on their properties and that ash particles were visible in the air over their properties so that it appeared to be "snowing ash" [Doc. 266, p. 6]. Referencing depositions given by individual plaintiffs and photographs taken of plaintiffs' properties and the area and bodies of water involved in and surrounding the ash spill, plaintiffs also assert that following the spill, they observed coal and fly ash on their properties and inside their homes [Doc. 268-8; Doc. 269-10; Doc. 268-11]. Plaintiffs have also provided photographs purporting to show the presence of ash on

26

plaintiffs' properties and in the waters surrounding their properties [*Id.*; Doc. 268-3].

Plaintiffs also assert that air sampling conducted by plaintiffs' experts found coal ash in the air over several plaintiffs' properties and that soil sampling from several of plaintiffs' properties have tested positive for the presence of ash [Doc. 247; Doc. 250].

Plaintiffs also contend that an issue of fact exists as to whether ash particles and the constituents in those particles were transported to their properties via the waters of the Reservoir and surrounding waterways. Contrary to TVA's assertion that coal ash sludge never came onto plaintiffs' properties, plaintiffs assert that a coal ash "tidal wave" reached higher than the top elevation of the Reservoir, coming over the shoreline strip and onto their properties the morning of the ash spill [Decl. Sulkin, Doc. 268-9, ¶¶ 3-4]. Plaintiffs argue that there were at least five high flow events in the waterways surrounding their properties that re-suspended the ash in the Reservoir and deposited it on their properties, above the top elevation of TVA's shoreline strip [Decl. Sulkin, Doc. 268-9, ¶¶ 8-14]. Finally, plaintiffs point to soil samples taken by the Tennessee Department of Environment and Conservation and the EPA, along with the analyses of plaintiffs' expert environmental consultants, and assert that constituents within ash, specifically, arsenic, has been found on plaintiffs' properties beyond the boundaries of the initial deposits of coal ash sludge [Decl. Mark Quarles, P.G. ("Quarles"), Doc. 268-9, ¶¶ 33-38; Decl. Sulkin, Doc. 268-9, ¶¶ 5, 13, 14; *Turner*, Aff. J. Fred Heitman ("Heitman"), Doc. 63-5, ¶¶ 2-6 (stating that he has taken samples from privately owned properties, analyzed the samples for heavy metals, and found elevated levels of the constituents founds in coal and fly ash)].

27

As noted above, the Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact, not to weigh the evidence or determine the truth of the matter. Upon review of this evidence, and viewing such evidence and the inferences to be drawn therefrom in a light most favorable to plaintiffs, the Court concludes that plaintiffs have raised an issue of fact as to whether the coal ash spill caused particles from coal or fly ash to enter their properties through ash present in ambient air, in water, or in subsequent high flow water events. Plaintiffs have also set forth an issue of fact as to whether the presence of these particles was caused by the ash spill rather than TVA's nondiscretionary conduct or conduct that occurred prior to the spill. While TVA has put forth evidence that coal or fly ash is not present in substantial quantities on plaintiffs' properties, plaintiffs have created an issue of fact as to whether ash particles entered plaintiffs' properties following the ash spill or were deposited onto plaintiffs' properties through ambient air or high water episodes following the spill, and an issue of fact regarding whether these particles or their constituents remain on plaintiffs' properties. Accordingly, given the law in Tennessee regarding what may constitute a trespass and the evidence submitted by plaintiffs, the Court cannot satisfactorily find that a genuine issue of fact does not remain as to whether particles from the coal ash spill entered plaintiffs' properties. Thus, TVA's requests for summary judgment as to plaintiffs' trespass claims are hereby **DENIED**.

### 2.       Plaintiffs' Nuisance Claims

Tennessee courts have defined a nuisance as "anything which annoys or disturbs the free use of one's property, or which renders its ordinary occupation uncomfortable . . . [and] extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." *Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 364 (quoting *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981)). Depending on the surroundings, activities that constitute a nuisance in one context may not constitute a nuisance in another. *Id.* Thus, whether a particular activity or use of property amounts to an unreasonable invasion of another's legally protectable property interests depends on the circumstances of each case, the character of the surroundings, the nature, utility, and social value of the use, and the nature and extent of the harm involved. *Id.* at 364-65; *see Pate*, 614 S.W.2d at 47. The standard by which a nuisance is measured is that of a normal or ordinary person in the community. *Jenkins v. CSX Transp., Inc.*, 906 S.W.2d 460, 462 (Tenn. Ct. App. 1995). One Tennessee court has described the standard for the harm claimed by a plaintiff and resulting from a nuisance to be:

> [T]he standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant. If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncrasies of the particular plaintiff may make it unendurable to him.

*Id.* (quoting Restatement (Second) of Torts § 821 cmt. d)).

The presence of a nuisance under Tennessee law has been found when odors emitted from a sewage lagoon made habitation of dwellings in the vicinity of the lagoon "almost impossible." *Pate*, 614 S.W.2d 46. Tennessee courts have also found that the accumulation of trash and debris on a piece of property constituted a nuisance when the "conglomeration of materials . . . constitutes a fertile breeding ground for undesirable vermin[,]" *Aldridge v. Morgan*, 912 S.W.2d 151 (Tenn. Ct. App. 1995), that noise from a concrete products plant could constitute a nuisance if it was sufficiently disturbing, intense, and incessant, *Caldwell v. Knox Concrete Prods., Inc.*, 391 S.W.2d 5 (Tenn. Ct. App. 1965), and that a junk yard constituted a nuisance when it contributed to an increase in the rat and mosquito population, was hazardous to children, and depreciated the value of nearby properties. *Hagaman v. Slaughter*, 354 S.W.2d 818 (Tenn. Ct. App. 1962). These cases demonstrate that what defines a nuisance and what constitutes the type of property interests involved in the use and enjoyment of property requires a specific inquiry into the specific facts and circumstances of each case.

TVA argues that plaintiffs cannot recover for their nuisance claims on the theory that the presence of coal ash particles in the waters of the Reservoir, the surrounding waterways, the shoreline strip, and on private property purchased by TVA, makes plaintiffs' recreational use of their properties less desirable and diminishes their use and enjoyment of such properties. TVA argues that plaintiffs have failed to present objective evidence that the ash spill caused ash concentrations on each plaintiff's property to increase significantly above historical background levels and asserts that because Tennessee nuisance law only prohibits

30

activities that substantially interfere with a reasonable person's use and enjoyment of property, plaintiffs cannot recover because they have not shown that the alleged ash concentrations in areas surrounding their properties reached levels that would substantially interfere with a reasonable person's ordinary health, sensibilities, and modes of living. *See North Carolina v. TVA*, 615 F.3d 291, 310 (4th Cir. 2010) (discussing Tennessee nuisance law as prohibiting activities that "substantially interfere with the average person—for example, a person of '*ordinary* health and sensibilities, and *ordinary* modes of living'") (emphasis in case) (quoting *Jenkins*, 906 S.W.2d at 462).

Plaintiffs argue that they have presented evidence demonstrating that the coal ash spill created a nuisance in regard to their properties and, as property owners, they have demonstrated that the ash spill substantially interfered with their use and enjoyment of their properties. As support for their claims, plaintiffs point to what they allege are noisy and disruptive clean-up activities, including heavy barges and dredges and bright lights in normally dark areas. Plaintiffs also point to evidence of the presence of ash in the waters surrounding their properties, a circumstance they assert has limited their ability to use their properties to enjoy the water-based recreational activities that used to be easily accessible from their properties. They also argue that the ash spill and its impact on the Reservoir and the surrounding waterways has prevented them from building or using their docks, boating, and swimming, and that the ash in the water and the various public warnings issued as a result of the spill have interfered with their ability to use their properties in the manner they contemplated when they initially purchased their properties and which was factored into the

31

value of their properties. Plaintiffs also assert that the discharge of ash into the waterways surrounding their properties caused a layer of scum and residue that has covered the water at various times and has caused a fish kill and mounds of dead fish in the water and on the shoreline of the Reservoir. Plaintiffs argue that this scum and dead fish have ruined their views, caused foul odors, and interfered with their use and enjoyment of their properties. Plaintiffs also assert that the ash spill and the presence of the ash on their properties and on areas surrounding their properties has attached a negative stigma to the area which has severely damaged the values of their properties, their ability to secure financing, and their ability to sell their properties. Plaintiffs assert that even if ash is not present on some of their properties, the ash has settled to the bottom of the Reservoir and the waterways near their properties and has been found floating on the top of the water near their properties. Finally, plaintiffs assert that measurable levels of ash are present along the riverbeds adjacent to their properties and they argue that this ash poses an ongoing threat to water quality, their recreational use of the waterways, and gives rise to a significant likelihood that the ash will enter the aquatic food chain [Doc. 266, pp. 20-22; Decl. Sulkin, Doc. 268-9, ¶¶ 7, 12-20; Decl. Quarles, Doc. 268-10, ¶¶ 20-23; Doc. 268-11; Docs. 268-11, -13].

First, as noted previously in the Court's discussion of actionable versus non-actionable conduct, plaintiffs cannot recover for their allegations arising out of TVA's post-spill removal and remediation conduct because this conduct falls under the discretionary function doctrine. *See Mays*, 699 F. Supp. 2d at 1016-19, 1033. This applies equally to plaintiffs' nuisance claims as well as their tort claims. *See In re TVA Ash Spill Litig.*, 2011 WL

1113425, at 18. Second, after a review of nuisance law in Tennessee, the Court disagrees with TVA that plaintiffs are required to show that ash concentrations are present on each plaintiff's property in an amount significantly above historical background levels in order to defeat TVA's requests for summary judgment on their nuisance claims. Third, while the Court agrees with plaintiffs that for a nuisance, they are not required to prove an invasion of their properties by coal ash specifically, plaintiffs *are* required to prove that the presence of coal or fly ash on their properties or on areas surrounding their properties, in the air, or in the Reservoir and surrounding waterways, constitutes an invasion of legally protectable *property interests* that rises to the level of what a reasonable person with ordinary sensibilities would consider an unreasonable interference with the use and enjoyment of property. Here, plaintiffs have not pointed the Court to a case where a plaintiff was able to recover for a nuisance *absent* a finding of an unreasonable invasion of a property interest such as the invasion of pollutants through the air over property, the coming of vermin or foul substances from a dump onto property, or noxious odors or incessant noises smelled or heard on property. *See Pate*, 614 S.W.2d at 47 (noting that the plaintiffs' property was in proximity to the defendant's sewage lagoon and finding a nuisance because the odor emanating from the lagoon had invaded the plaintiffs' property and made habitation of nearby dwellings almost impossible); *Cissom v. Miller*, No. E1999-02767-COA-R3-CV, 2001 WL 456062, at *1 (Tenn. Ct. App. Apr. 30, 2001) (noting that the plaintiffs' property was in close proximity to the defendant's chicken houses and finding a nuisance because the foul odors emanating from the chicken houses had invaded their property).

33

Furthermore, the mere proximity of plaintiffs' properties to the areas impacted by the coal ash spill or the decrease in the value of their properties due to negative stigma does not, without a finding that a legally protectable property interest was invaded, result in a finding of a nuisance. Illustrating this point is *Wilson v. Farmers Chem. Ass'n.*, in which the type of nuisance and harm alleged is similar to that alleged in this litigation. 444 S.W.2d 185 (Tenn. Ct. App. 1969). In *Wilson*, the plaintiffs were riparian owners of a partially developed residential subdivision located near the defendant, a manufacturer of fertilizers and ingredients for TNT. *Id.* at 186. The plaintiffs alleged that the defendant had caused a nuisance by emitting pollution into the atmosphere above the plaintiffs' property and into the waters of Wyconda Bay, a body of water adjacent to the plaintiffs' property. *Id.* In a finding affirmed by the court of appeals, the trial court agreed with the plaintiffs that the defendant had maintained a nuisance by polluting air over the plaintiffs' property with soot, particulates, ammonia, oxides and other compounds of nitrogen and other chemicals. *Id.* The *Wilson* court then found that

> These pollutants have seriously impaired the usable value of [the plaintiffs'] property. Likewise, the defendant has polluted and continues to pollute the waters of Wyconda Bay by discharging through a drainage ditch running from its plant to the Bay huge quantities of water which contain ammonia, oxides of nitrogen and other poisonous chemicals which have caused numerous kills of thousands of fish, the decaying of which has fouled the air over [the plaintiffs'] property and fouled the waters of the Bay, thereby rendering it unfit for normal boating and swimming purposes. This pollution of the waters of the Bay has likewise caused substantial injury to the usable value of [the plaintiffs'] property. . . . There can be little doubt that, due to [the] defendant's activities, [the plaintiffs] have been seriously handicapped in selling lots and as a result of these difficulties and the reluctance of

34

buyers to purchase and develops lots [the plaintiffs] have deferred improving a considerable portion of their lands.

*Id.* at 106-07. After noting that previous Tennessee courts have found that incessant and disturbing noises may constitute a nuisance, and that smelly and unsightly dumps where rats and mosquitoes converge and bred may also constitute a nuisance, the *Wilson* court found that under the facts of that case, "the offensive odor and sight of decaying fish and the pollution of the atmosphere with dirty and odorous fallout, resulting in heavy damage to property, cannot with reason be said to be less than a nuisance." *Id.* at 108.

The *Wilson* court found that a decrease in the value of the plaintiffs' properties and the impact of the defendant's conduct on the plaintiffs' abilities to sell lots in the subdivision were some of the circumstances that factored into the trial court's finding of a nuisance. Important to this litigation, the *Wilson* court also found that the plaintiffs' property interest had been invaded because the plaintiffs' use and enjoyment of their property had been substantially impaired by the air pollution over their property and the fouling of the Bay surrounding their property due to emissions from the defendant's facilities. 444 S.W.2d at 106-07. Moreover, a measure of the damages the plaintiffs were found to be entitled to were "damages as riparian owners" of property adjacent to the polluted Bay. *Id.* at 105.[10]

However, given Tennessee law regarding a nuisance, particularly the factors and circumstances discussed in *Wilson*, and viewing the collective evidence of record in the light

_____

[10]The Court has no evidence before it that a plaintiff in this litigation is a riparian owner of property along the Reservoir.

most favorable to plaintiffs, including evidence that ash particles came onto plaintiffs' properties, that ash particles entered and remain in the Reservoir and on the shoreline strip surrounding plaintiffs' properties and that the presence of this ash has interfered with their use and enjoyment of their properties in that plaintiffs can longer use their properties as staging areas for recreational boating and swimming, that the ash has caused unsightly and smelly scum on waters next to their properties, has caused fish to die and decay within sight of their properties, and has caused their properties to have lost some of their usable value, the Court concludes that plaintiffs have raised a genuine issue of fact in regard to their claims that the coal ash spill caused a nuisance in regard to their properties.

### 3. Plaintiffs' Property Damage Claims

No party has provided the Court with a thorough explanation of the distinction between proving causation for a trespass claim and proving causation for a pure property damage claim. In fact, both parties refer to plaintiffs' claims for trespass and nuisance as "property-related" claims, focusing the inquiry on causation on plaintiffs' trespass claims as opposed to plaintiffs' pure property damage claims. For instance, in the *Chesney* plaintiffs' response to TVA's supplemental brief, these plaintiffs refer to their property damage claims as "claims for nuisance and trespass" and do not refer to pure property damage claims [*see* Doc. 340], in the *Turner* plaintiffs' response to TVA's motion for summary judgment, these plaintiffs only explicitly discuss causation in terms of their nuisance and trespass claims [*see Turner*, Doc. 63, pp. 6-12], and TVA's reply brief does not distinguish between trespass claims and pure property damage claims [*see* Doc. 289, pp. 20-26]. Thus, upon the Court's

36

review of the briefs in this case, it appears to the Court that the parties' analyses of the "property-related" claims in this litigation subsume plaintiffs' trespass and pure property damage claims into one. However, a detailed scrutiny of TVA's motions for summary judgment and the complaints in this litigation indicate that plaintiffs have not abandoned pure property damage claims arising out of negligence, negligence per se, recklessness, and strict liability—claims that are, at least in plaintiffs' complaints, distinct from plaintiffs' trespass claims [*See, e.g., Auchard, et al. v. TVA* ("*Auchard*"), Case No. 3:09-CV-54, Doc. 437, ¶¶ 246-295].

*Beaty Chevrolet Co. v. Norfolk So. Railway Co.*, a case discussed by TVA, articulates the causation analysis for pure property-related claims of damage to chattel, specifically, alleged damage to the surfaces and trim of the plaintiff's vehicles as a result of what the plaintiff alleged were toxic contaminants released into the environment by the derailment of a train transporting chemicals and owned by the defendant. 2005 WL 1182444, at *1-*2. In *Beaty*, the district court's inquiry into the plaintiff's claims of property damage to his vehicles demanded a showing of causation establishing some means by which the toxic contaminants could have been transported to the property where the plaintiff's vehicles were located. *Id.* at *3-*4. After this showing of a transport mechanism or causation pathway, the district court then required the plaintiff to show that the toxic constituents was transported to the plaintiff's property and onto the vehicles in sufficient concentrations to result in damage to the vehicles. *Id.*

37

Given this causation analysis in *Beaty* for a pure property damage claim to chattel, it appears to the Court that the causation inquiry for a claim for pure property damage to real property is more stringent than that required for a trespass claim, most particularly in the level of damage that must be established. For a pure property damage claim to chattel, a plaintiff must show that toxic constituents reached the property in sufficient concentrations to result in actual damage. This is distinguishable from a trespass claim in which "[e]very unauthorized entry upon another's realty is a trespass, regardless of the degree of force used or the amount of damage[,]" *Burlison*, 2011 WL 1002808, at *8, and in which nominal damages may be awarded. It does not follow, however, that the causation inquiries of *Bain* and *Robinson* for claims for personal injury and emotional distress apply without modification to pure property damage claims, particularly given those courts' requirements that plaintiffs show actual ingestion or use of the toxic constituent. Accordingly, in light of the Court's findings above in regard to plaintiffs' trespass claims, the issues of fact regarding whether ash particles entered plaintiffs' properties following the ash spill or were deposited onto plaintiffs' properties through ambient air or high water episodes following the spill, whether these particles or their constituents remain on plaintiffs' properties, the lack of specific argument by the parties distinguishing the causation inquiry and the requisite level of harm to real property for plaintiffs' pure property damage claims versus plaintiffs' trespass claims, and to the extent plaintiffs continue to pursue pure property damage claims, there remains issues of fact as to whether plaintiffs have satisfied their burden of proving causation

38

in regard to their pure property damage claims. Thus, TVA's requests for summary judgment as to plaintiffs' pure property damage claims are hereby **DENIED**.

### E. Plaintiffs' Inverse Condemnation Claims

Several plaintiffs in the above-cited cases have also alleged inverse condemnation claims against TVA, asserting that "plaintiffs hold legal title to property which has been taken and/or injured by . . . TVA's discharge of coal ash sludge and contaminated water." [*see Raymond*, Case No. 3:09-CV-48, Doc. 98, ¶ 86]. TVA asserts that these plaintiffs have failed to come forward with objective evidence sufficient to establish that either the coal ash spill or TVA's post-spill response conduct caused concentrations of ash particles on plaintiffs' properties to increase significantly above historical background levels and to potentially toxic concentrations. TVA also asserts that plaintiffs' allegations that ash particles remain on lands and/or waters surrounding, adjacent to, or in the vicinity of their properties does not establish issues of fact for purposes of plaintiffs' inverse condemnation claims.

In response, plaintiffs contend that summary judgment in TVA's favor on their inverse condemnation claims is inappropriate because TVA has only addressed the narrowest view of an inverse condemnation claim and has ignored their claims for economic losses related to the contamination of their waterfront properties. Plaintiffs also argue that they have offered objective evidence that ash came onto their properties as a result of TVA's nondiscretionary conduct. Finally, citing the Sixth Circuit case of *Amen v. Dearborn*, plaintiffs argue that TVA's conduct amounts to a constructive taking because it contributed

39

substantially to and accelerated a decline in the values of their properties. 718 F.2d 789 (6th Cir. 1983)

As noted in *Ridge Line, Inc. v. United States*, "[i]nverse condemnation law is tied to, and parallels, tort law." 346 F.3d 1346, 1355 (Fed. Cir. 2003) (quoting 9 Patrick J. Rohan & Melvin A. Reskin, Nichols on Eminent Domain § 34.03[1] (3d. 1980 & Supp. 2002)). However, the distinction between a tort and a taking is not well-defined. *See Hanson v. United States*, 65 Fed. Cl. 76, 80-81 (Fed. Cl. 2005) ("[T]here is no clear cut distinction between torts and takings . . . . and [t]he best that can be said is that not all torts are takings, but that all takings by physical invasion have their origin in tort law"). "Thus, not every 'invasion' of private property resulting from government activity amounts to an appropriation." *Ridge Line, Inc.*, 346 F.3d 1355.

The Court has previously addressed the inverse condemnation claims asserted in this litigation. *Mays*, 699 F. Supp. 2d at 1025-27. In finding that plaintiffs had stated claims for inverse condemnation sufficient to survive a motion to dismiss, the Court described an inverse condemnation claim as follows:

> Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke*, 445 U.S. 253, 257 (1980). A claim for inverse condemnation involves a two-part test that can be characterized as a causation prong and an appropriation prong. *See, e.g.,* [*Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009); *Ridge Line*, 346 F.3d 1346.] As to the causation prong, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or

40

consequential injury inflicted by the action." *Ridge Line, Inc.*, 346 F.3d at 1355-56 (citation and quotations omitted). As to the appropriation prong, "[e]ven where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value. *Id.* at 1356. Under the appropriation prong, the nature and magnitude of the government action must be considered. *Id.* at 1355-56.

*Id.* at 1026. Pursuant to the test described above, a plaintiff must satisfy both the causation and the appropriation prong in order to demonstrate that his or her claim is properly analyzed under takings law. Furthermore, in *Amen v. Dearborn*, a case cited by plaintiffs in support of their constructive taking argument, the Sixth Circuit observed that "a taking does not occur merely because governmental action burdens or restricts some particular right or interest in a parcel of land. Rather, before a taking occurs the government must deny the owner *all or essential use* of his property." *Id.*, 718 F.2d at 795 (emphasis added).

In reviewing the evidence of the presence of coal or fly ash on plaintiffs' properties, amounts of ash which, as noted previously, are not substantial, the Court is not persuaded that plaintiffs have met their burden of showing a genuine issue of fact that they have been denied "all or essential use" of their properties. Furthermore, the Court is not persuaded that the presence of coal or fly ash on land or in water in the vicinity of, surrounding, or adjacent to plaintiffs' properties creates factual questions for purposes of plaintiffs' inverse condemnation claims. Plaintiffs' claims, that toxic constituents were deposited and remain on their properties resulting in takings of their properties for purposes of the Fifth

41

Amendment, require a greater showing of deprivation of use than plaintiffs' trespass or nuisance claims. Moreover, even if land or water adjacent to, surrounding, or in the vicinity of plaintiffs' properties was taken by TVA for purposes of the Fifth Amendment, this alone does not constitute a taking of plaintiffs' properties. As stated in *Campbell v. United States*, a case which involved the government's taking of property in the vicinity of the plaintiff's property in order to erect an explosives plant, the U.S. Supreme Court observed that "[t]he proposed use of the lands taken from others did not constitute a taking of [the plaintiff's] property. [The plaintiff] had no right to prevent the taking and use of the lands of others; and the exertion by the United States of the power of eminent domain did not deprive [the plaintiff] of any right in respect of such lands." 266 U.S. 368, 371 (1924) (internal citations omitted).

In *Woodland Market Realty Co. v. Cleveland*, the Sixth Circuit reiterated the proposition expressed in *Campbell* in the context of an urban setting. 426 F.2d 955, 958 (6th Cir. 1970. In *Woodland*, a case involving an urban redevelopment project by the city of Cleveland, the plaintiff, a company which leased a tenant-occupied market building, alleged that the value of its leasehold interest in the commercial property had been destroyed by the city's activities in carrying out its renewal project. *Id.* at 956-57. These activities included acquiring property near the commercial property leased by the plaintiff and removing all structures and inhabitants from the acquired property. *Id.* at 957. The court rejected the plaintiff's claim for inverse condemnation, noting that the "losses occasioned to the plaintiff were not the result of any intrusion or encroachment" by the city, even though the city's

42

renewal project may have resulted in a decrease in the value of the land. *Id.* at 957-58. The city's actions, the court concluded, "resulted in no diminution of the plaintiff's rights in its property." *Id.* at 958.

Similarly, in this litigation, if TVA's conduct resulted in a taking of property in the vicinity of, surrounding, or adjacent to plaintiffs' properties, such conduct is not a taking unless it also resulted in a diminution of plaintiffs' property rights that rises to the level of a taking. This is particularly true when, as here, plaintiffs are not riparian owners with riparian rights [*see* Doc. 222, pp. 20-21]. Plaintiffs have provided the Court with no documentation regarding any ownership of riparian rights and no legal authority indicating that, by virtue of owning property located adjacent to water over which they have no riparian rights, they nevertheless hold private property interests in that water.

Even if plaintiffs were riparian owners, they have provided no legal authority supporting their assertions that a taking of their rights to go boating, fishing, swimming, or other recreational activities on adjacent water over which they have no private property interest constitutes a taking of a private property interest compensable as a taking under the Fifth Amendment.

> [A]warding compensation to plaintiffs for the alleged taking of a "property right" that is held in common with the general public would be inconsistent with the compensatory purposes of the Takings Clause. The Supreme Court has further observed that the "Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

43

*Mildenberger v. United States*, 91 Fed. Cl. 217, 246-247 (Fed. Cl. 2010) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)) (holding that the plaintiffs could not seek compensation for the alleged taking of their asserted rights to "fish, swim, bathe, view wildlife, or operate a boat"). Moreover, the alleged taking of a right to pollution-free water in a navigable waterway is not a special injury sustained by plaintiffs but an injury sustained by the general public. *Mildenberger*, 91 Fed. Cl. at 246-47. Accordingly, the Court finds untenable plaintiffs' assertions that the presence of coal ash in the water in the vicinity of, adjacent to, and surrounding their properties constitutes a taking.

Plaintiffs have also asserted that TVA's conduct amounts to a constructive taking because TVA's actions have substantially contributed to and accelerated the decline of property values in the area affected by the coal ash spill [Doc. 266, p. 30 (quoting *Amen*, 718 F.2d at 796)]. Plaintiffs argue that evidence of the presence of coal ash on their properties is not required to sustain their claims for inverse condemnation when TVA's actions have substantially contributed to and accelerated the decline in value of their properties. *Amen*, 718 F.2d 789. The Court, however, does not find the facts of *Amen*, or the facts of the cases cited therein, to be applicable to this litigation.

In *Amen*, the court found that the city of Dearborn used its governmental powers to issue building, repair, and occupancy permits to deny and unreasonably delay permits to residents in a certain area of the city, thereby encouraging residents to relocate out of the area. 718 F.2d at 797. The court also found that the city used its governmental powers to require excessive remodeling from the plaintiffs, demanded maintenance and installations

44

that were not required by the applicable building codes, and allowed certain properties to

remain vacant and unprotected in order to encourage residents living in the vicinity to sell

their properties to the city. *Id.* In light of this conduct and the city's use of its governmental

power, the *Amen* court concluded that the city's actions amounted to an unconstitutional

course of conduct which effectively forced residents to sell to the city and a "deliberate

course of conduct [that] caused such substantial damage to plaintiffs' properties that the

properties in effect were actually taken . . . ." *Id.* at 797-98.[11]

The facts and circumstances of this litigation and TVA's alleged conduct is not similar

to what occurred in *Amen* and the conduct of the city of Dearborn. The *Amen* court noted

that the city's conduct in that case—denying building permits, denying property

reassessments, continuous publication of redevelopment plans, and denying city

services—"demonstrate[s] clearly that activities other than actual condemnation and physical

intrusion" can constitute a taking. *Id.* at 797. Plaintiffs in this litigation have not alleged that

TVA engaged in conduct similar to that engaged in by the city of Dearborn. Rather,

plaintiffs' claims for inverse condemnation are based on alleged physical invasions of ash

particles that allegedly contaminated their properties with toxic metals and chemicals. There

---

[11]Plaintiffs have also noted the *Amen* court's citation to *Foster v. City of Detroit*, 254 F. Supp. 655 (E.D. Mich. 1966), *aff'd*, 405 F.2d 138 (6th Cir. 1968), in which the *Amen* court found the conduct of the city of Dearborn "not dissimilar" to the conduct of the city of Detroit in *Foster*. *Amen*, 718 F.2d at 796-97. In *Foster*, like in *Amen*, the court found that the city's actions in bringing about condemnation proceedings over areas of the city–including plaintiffs' properties–had substantially contributed to and accelerated the decline of property values in the affected areas and thus, the actions of the city constituted an unconstitutional taking of the properties before the actual condemnation of the properties occurred. *Foster*, 254 F. Supp. 655. After reviewing these cases, the Court finds neither *Amen* nor *Foster* to be similar to the facts in this litigation.

45

are no allegations that TVA engaged in a deliberate course of conduct with the object of reducing the value of plaintiffs' properties by using its governmental powers to issue selective permits, implement development plans, or levy tax assessments directed towards plaintiffs, as found in *Amen*. In short, the Court does not find the facts of this litigation and the alleged conduct by TVA similar to the facts and conduct which the court in *Amen* found indicative of a taking.

Finally, plaintiffs' assertions that the coal ash has devalued their properties do not, without more, constitute a taking. "[A] taking does not occur merely because the governmental action burdens or restricts some particular right or interest in a parcel of land; rather, before a taking occurs, the government must deny the owner all or an essential use of his property. The mere decline in property values does not constitute, per se, a taking requiring just compensation." *Cook v. Cleveland State Univ.*, 13 F. App'x 320, 321-22 (6th Cir. 2001) (citing *Amen*, 718 F.2d at 794).

In sum, TVA's requests for summary judgment as to plaintiffs' inverse condemnation claims are **GRANTED**.

## IV.    Conclusion

For the reasons set forth above, TVA's Motions for Summary Judgment on Plaintiffs' Tort and Inverse Condemnation Claims on Grounds of No Causation [Doc. 221] are **GRANTED in part** and **DENIED in part**. The motions are **GRANTED** to the extent that summary judgment is entered in TVA's favor as to plaintiffs' personal injury, emotional distress, and inverse condemnation claims. The motions are **DENIED** to the extent that the

46

Court finds summary judgment in TVA's favor to be inappropriate for plaintiffs' property-related claims of pure property damage, trespass, and nuisance.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE